## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN

TERANCE CALHOUN, by and
through his legal conservators,
Octavia Monroe and Theodore W.
Goodman,

          Plaintiff,

v.

City of Detroit Police Department
Sergeant ROBERT KANE, Police
Officer JOSE ORTIZ, Police Officer
MICHELE JASKULKA,
Commander JAMES TOLBERT,
Lieutenant BILAL MUHAMMAD,
JESSE DOE I, JESSE DOE II, and
JESSE DOE III, in their official
and/or individual capacities, jointly
and severally,

          Defendants.

**COMPLAINT AND
DEMAND FOR JURY
TRIAL**

NOW COMES Plaintiff **TERANCE CALHOUN**, by and through his legal
conservator of his person, Octavia Monroe, and by and through his legal conservator
of his property, Theodore W. Goodman, Esq., and his attorneys, the law firms of
Neufeld Scheck Brustin Hoffmann & Freudenberger, LLP, and of Goodman Hurwitz
& James, P.C., and for his Complaint in this matter, states as follows:

## **INTRODUCTION**

1. In 2006 to 2007, Plaintiff **TERANCE CALHOUN**—at 19-years old with a severe cognitive disability—was wrongfully arrested, prosecuted, convicted, and sentenced from 15 to 30 years in prison on felony charges in two cases concerning separate sexual attacks on young girls in Northwest Detroit that he did not commit.

2. DNA evidence in the Detroit Police Department ("DPD")'s custody proved Calhoun's innocence; yet that evidence was covered up while Calhoun spent over 15 years wrongly imprisoned—from ages 19 to 34—until his exoneration on April 27, 2022. With that evidence disclosed, Calhoun has been proven actually innocent and the true perpetrators—two separate serial rapists—have been identified.

3. Calhoun's many years of wrongful imprisonment were not an accident; rather his nightmare and suffering was the direct result of serious misconduct by the Defendant DPD supervisors, detectives and police officers who were content to take advantage of and railroad an innocent and mentally impaired 19-year-old Calhoun.

4. Instead of conducting a serious investigation that would have actually identified the true perpetrators of the sexual assaults, Defendants coerced and fabricated a false confession, planted evidence, and used unlawful suggestion to obtain false identifications from the two young teenage victims. Worse, for years Defendants hid and withheld exculpatory forensic evidence that exonerated Calhoun to cover up both Calhoun's innocence and their egregious misconduct in this case.

2

5. In the fall of 2006, two separate sexual attacks occurred about a month apart in separate locations in Northwest Detroit, Michigan, committed by two different serial rapists: (1) on September 26, 2006, Ralph Douglass Tucker accosted a minor, age 15—"*MV*"—by forcing her into an alley near the intersection of Fenkell Avenue and Blackstone Street before she managed to escape; and (2) on October 27, 2006, Lionel Jarvon Wells sexually assaulted another minor, age 13—"*BH*"—at gunpoint in an alley behind the Checkers Liquor Store on Fenkell Avenue and Patton Street.

6. A week after *BH*'s assault and based solely on an alleged resemblance to a composite sketch of her attacker, the 19-year-old Calhoun while on an errand for his stepfather at the Checkers Liquor Store was arrested and taken to the precinct.

7. At the time of his arrest in 2006, Calhoun had an IQ of around 70, had (what was then described as) a "mild mental retardation," and functioned at the level of a 10- to 12-year-old. Calhoun also received monthly SSI Disability benefits and had graduated from a special needs program at a local high school just a year earlier.

8. While detained at the precinct, Defendant **ROBERT KANE** conducted an unrecorded interrogation of Calhoun without any attorneys, guardians nor witness present. Defendant Kane used impermissible pressure, made false promises of friendship and leniency, and exploited Calhoun's mental and physical vulnerabilities to get him to acquiesce to a false and fabricated "confession" that was authored

exclusively by Defendant Kane because, in addition to Calhoun's limited cognitive abilities, his reading and writing skills at the time were also described as "minimal."

9. Defendant Kane then coerced the vulnerable Calhoun to sign and initial the pre-authored false confession. To make the false confession appear reliable, Defendant Kane inserted non-public details about the crime that only the true perpetrator or police would know, then misrepresented that Calhoun had volunteered the details in the false confession which in fact had been supplied by Defendant Kane. Defendants later misrepresented to prosecutors that Calhoun's false confession was obtained through a lawful interrogation, without threats or promises.

10. Defendants also seized the opportunity to close another open sexual assault case—the earlier attack on *MV*—by arresting Calhoun for that crime as well.

11. Even though the contemporaneous descriptions by the two minor victims of their two separate attackers given to the Defendants differed from each other and from Calhoun, Defendants used impermissible suggestion and/or other improper tactics to get *BH* and *MV* to misidentify Calhoun, and later misrepresented that both victims had made positive identifications without any pressure nor suggestion.

12. Because Calhoun is innocent, no reliable evidence ever connected Calhoun to the sexual assaults around the Fenkell Avenue area. However, based on Defendants' misrepresentations about the evidence implicating him, on February 21, 2007, Calhoun—who had a severely limited cognitive abilities, never been charged

4

with a crime before, and had been sitting in custody since the date of his arrest more than five (5) months earlier—pled "no contest," meaning he asserted his innocence, but purportedly acknowledged that there was sufficient evidence to convict. Calhoun was then convicted of felony charges for both cases, and on March 28, 2007, sentenced to 15 to 30 years in prison for crimes that he did not commit.

13. Less than three (3) months after Calhoun's sentencing, on June 15, 2007, DNA testing on a condom used by *BH*'s assailant—that had been retrieved from the crime scene—excluded Calhoun as the source. Defendants concealed this proof of Calhoun's innocence and relied on their fabrications to preserve Calhoun's wrongful conviction for the sexual assault crimes and to continue to cover up their egregious misconduct. Moreover, Defendants neither informed the prosecutor nor Calhoun's defense of this critically exculpatory evidence, leaving Calhoun sitting in custody.

14. No reasonable officer could have failed to understand they were obligated to share this definitive exculpatory DNA evidence from the sexual assault of a child to the prosecution and defense. But instead of sharing this DNA evidence, officers allowed Calhoun—an innocent, severely cognitively disabled young man—to stay locked up, where he remained for another almost 15 years wrongfully incarcerated.

15. On January 14, 2019, per the Sexual Assault Kit Initiative (SAK) protocol, a SAK official who was addressing the backlog of rape and assault kits sitting in the custody of the DPD, finally took the time to review Calhoun's cases. Then, based on

the June 2007 lab report from years earlier, the Wayne County's Prosecutor Office notified the State Appellate Defender Office ("SADO") of the exclusionary results.

16. Just a few months later, on September 2, 2019, the SADO also received a Bode Technology report on the STR analysis of the DPD's collected biological samples, which also excluded Calhoun as a possible contributor from the *BH* assault.

17. Even after the 2007 report was rediscovered in 2019, Calhoun's wrongful conviction persisted until January 10, 2022, when the Michigan State Police ("MSP") found a Combined DNA Index System ("CODIS") report matching the DNA from *BH*'s sexual assault to serial rapist Lionel Jarvon Wells—who had committed at least five other rapes of teens in the Detroit area from 2007 to 2014.

18. Then the Wayne County Prosecutor's Office Conviction Integrity Unit ("CIU") conducted a national search of law enforcement databases identifying serial rapist Ralph Douglass Tucker—who had raped at least five Detroit area women—as having braids and the uniquely identifying jigsaw-puzzle tattoo *MV* had described seeing on her assailant, thus the true perpetrators were identified for both cases.

19. Based on Defendants' misconduct, Calhoun was wrongly prosecuted, convicted and then remained in wrongful custody for over 15 years for crimes that were committed by two separate serial rapists, at least one of whom went on to commit other violent crimes while Calhoun was sitting wrongfully in custody.

20. This action seeks to remedy Calhoun for the over 15 years he needlessly spent as a wrongfully convicted prisoner, the loss of his time and his continuing suffering by holding those who illegally caused his wrongful conviction accountable.

## **THE PARTIES**

21.    Plaintiff **TERRANCE CALHOUN,** including by and through his legal conservator of his person, Octavia Monroe,[1] and his legal conservator of his property, Theodore W. Goodman, Esq.,[2] was at all times material to this complaint a resident of the State of Michigan, and for his time in the custody of the Michigan Department of Corrections, was a resident of the County of Wayne, City of Detroit. Currently, Calhoun resides with relatives in Rutherford County, TN. For all practical purposes, Calhoun is illiterate and severely cognitively disabled, with an IQ of about 70. His functional age at all times herein was between 10 and 12 years old.

22.  At all times relevant to this action, Defendant **ROBERT KANE** was a Sergeant and supervisor in the Sex Crimes Unit or otherwise employed at the DPD.

---

[1] Octavia Monroe was ordered as the legal conservator of Calhoun's person by Hon. Darrell Scarlet, Chancery Court Judge for Rutherford County, TN on December 16, 2022.

[2] Theodore W. Goodman, Esq. is an attorney licensed to practice in the State of Tennessee. Mr. Goodman was ordered as the legal conservator of Calhoun's property by the Clerk and Master Adam T. Dodd at the Chancery Court for Rutherford County, TN on April 12, 2023. There was no relation between Attorneys Theodore Goodman and William Goodman, who was a partner at Goodman Hurwitz & James, P.C. until his recent death. The shared last name is coincidental.

He is sued in his individual capacity and was acting under color of law, pursuant to the statutes, ordinances, regulations, policies, customs and usage of the City of Detroit. He supervised the investigation of the crimes with which the Plaintiff was charged. As a Sergeant of the Sex Crimes Unit of the DPD, Kane also supervised the actions of the other individually named and designated Defendants herein.

23. At all times relevant to this action, Defendant **JOSE ORTIZ** was the Officer in Charge of and conducted the investigation of the crimes with which the Plaintiff was charged or otherwise employed at the DPD. He is sued in his individual capacity and was acting under color of law pursuant to the statutes, ordinances, regulations, policies, customs and/or practices of the City of Detroit. Ortiz, as the lead officer for investigating the crimes for which Plaintiff was charged, supervised the actions of other individually named and designated Defendants herein.

24. At all times relevant to this action, Defendant **MICHELE JASKULKA** was a police officer who participated in and undertook the investigation of the crimes with which the Plaintiff was charged or otherwise employed at the DPD. She is sued in her individual capacity and was acting under color of law pursuant to the statutes, ordinances, regulations, policies, customs and/or practices of the City of Detroit.

25. At all times relevant to this action, Defendant **JAMES TOLBERT** was a Commander of the Major Crimes Division's Sex Crimes Unit and supervisory officer, and Defendant **BILAL R. MUHAMMAD** was a Lieutenant and also a

8

supervisory officer or otherwise employed at the DPD, and both are sued in their individual capacities and were acting under color of law, pursuant to the statutes, ordinances, regulations, policies, customs and usage of the City of Detroit. They both supervised the investigation of the crimes with which the Plaintiff was charged.

26. At all times relevant to this action, Defendants **JESSE DOE I - III** participated in and undertook the investigation of the crimes with which the Plaintiff was charged or otherwise employed at the DPD. They would be sued in their individual capacities and were acting under color of law pursuant to the statutes, ordinances, regulations, policies, customs and/or practices of the City of Detroit.

## <u>JURISDICTION</u>

27. This action is brought pursuant to 42 U.S.C. §§ 1983 and 1988, the Fourth, Fifth and Fourteenth Amendments to the United States Constitution, and the laws and Constitution of the State of Michigan.

28. Jurisdiction is founded upon 28 U.S.C. §§ 1331, 1343, and 2202.

29. Venue is proper under 28 U.S.C. § 1391(b), as the claims arose in the United States Eastern District of Michigan.

## <u>FACTUAL ALLEGATIONS</u>

**The sexual crimes in the Fenkell Neighborhood of Northwest Detroit committed by serial rapists Ralph Douglass Tucker and Lionel Jarvon Wells.**

30. At approximately 4:00 pm on September 26, 2006, serial rapist Ralph

Douglass Tucker approached 15-year-old *MV* who was walking on her way home from school near Fenkell Avenue and Blackstone Street in Detroit and told her to "give me a kiss" and "let me show you something."

31. As *MV* turned to walk away, Tucker grabbed her by the arm and dragged her into a nearby alley and pushed her to the ground.

32. After a struggle, *MV* was able to get away and ran home and told her mother of the incident, and the police were called.

33. *MV* described her assailant as having long braids and a distinctive tattoo on his inner arm that looked like jigsaw puzzle pieces.

34. About a month later, at approximately 7:30 a.m. on October 27, 2006, serial rapist Lionel Jarvon Wells approached 13-year-old *BH* who was walking to a bus stop located on Fenkell Avenue and Patton Street in Detroit.

35. While *BH* was walking on Patton Street towards the bus stop, Wells walked towards her and asked if she had change for a dollar, and she answered "no."

36. Wells then walked past *BH* and turned to place himself behind her, at which point Wells put what *BH* described as a "black" gun to her back and forced her towards an alley behind the Checkers Liquor Store, where they stopped by a brown garbage dumpster.

37. Once stopped at the dumpster, Wells told *BH* to remove her clothing. Wells then pulled down her underwear, put on a condom, and attempted to anally

penetrate *BH*, who prevented anal penetration by placing her hands in the way.

38. Wells then became frustrated, removed the condom and threw it onto the ground near the dumpster and then forced *BH* to perform oral sex on him and he ejaculated in her mouth. Wells instructed *BH* to spit the semen onto the ground.

39. Wells threatened *BH* to stay quiet, said he knew where she lived and would kill her and her family if she told the police and fled on foot. After Wells fled, *BH* immediately ran and told her mother who called the police to report the crime.

### The Detroit Police Department responds to the *BH* crime scene.

40. On the morning of *BH*'s sexual assault, the DPD dispatched police officers from its Sex Crimes Unit ("SCU"), including Defendant Officer MICHELE JASKULKA, who after being assigned to the case was directed to the emergency room of Grace Hospital where the 13-year-old *BH* was receiving medical care.

41. When DPD officers initially interviewed the 13-year-old *BH*, who was in the hospital in the presence of her mother and uncle, she stated that she was standing at the bus stop on Fenkell Avenue and Patton Street in front of the Checkers Liquor Store when she was approached from behind by a Black male who was carrying a handgun and wearing a "long green coat . . . with a hood" and black pants.

42. *BH* further stated he led her behind the store near a brown dumpster where he put on a condom and tried to force his penis inside her, but she resisted and kept pulling her pants up. Then, *BH* further explained the attacker threw the condom on

11

the ground by the dumpster, forced her to kneel, made her perform oral sex on him and before eventually running off threatened her by saying, as she reported to police that day, "If you tell, I'm going to come to your house and kill you."

43. Thereafter, more DPD officers arrived at the hospital and called Defendant SCU's Commander JAMES TOLBERT to notify him of the incident. They also interviewed *BH*'s sister and wrote a report they faxed over to Tolbert that same day.

44. By the afternoon of the *BH* incident, on October 27, 2006, Defendant Officer JOSE ORTIZ, who by this time had been assigned as the lead investigator, directed *BH* to be transported the Department's graphic arts section where a composite sketch was created based on her description of her attacker to DPD officers that morning.

45. Back at the crime scene where *BH* was attacked, from around 1:30 to 2:15 p.m., a DPD evidence technician took photographs and secured forensic evidence, including the used condom found where *BH* had described the incident occurring in her statements to police: the alley behind the Checkers Liquor Store near a dumpster.

**Defendants create a composite sketch that resembles Lionel Jarvon Wells, the true perpetrator of the October 2006 sexual assault of 13-year-old *BH*.**

46. Within three hours of being attacked, 13-year-old *BH* described her rapist to the DPD officers as: a 25 to 26-year-old Black male between 5'8" and 5'10," a

12

medium build with brown skin and brown eyes. She did not indicate any signs of an intellectual disability.

47. In October 2006, Lionel Jarvon Wells—the true perpetrator of the second crime—was a 27-year-old Black male, at 5' 8" tall; thus, closely resembling *BH*'s description of her rapist.

48. In October 2006, Terance Calhoun—who was innocent—was a 19-year-old Black male, at only 5'5", 125 pounds and slight with a noticeable intellectual impairment when he spoke.

### Defendants arrest Calhoun without reason and fabricate evidence.

49. In the days after 13-year-old *BH*'s sexual assault, DPD officers posted their composite sketch around the Fenkell Avenue area and provided it to the press.

50. Meanwhile, Detroit Public School officials at a local high school in the area near the scene of the assault held a press conference offering a $50 cash reward for anonymous tips that would result in an arrest in the case and made a plea for residents to be the "eyes and ears" needed to report crimes near the city's schools.

51. On October 29, 2006, Defendant Officer Jaskulka, who was assigned to investigate both cases, passed out copies of the composite sketch in the area and met with the 15-year-old *MV*—the victim who had been accosted just a month earlier in the area—and in an unrecorded interview and, upon information and belief, using

impermissible suggestion or other improper tactics, got *MV* to state that the composite was the "same man" who had tried assaulting her the month before.

52. At this time, 19-year-old Calhoun lived with his mother, stepfather and siblings on Burt Street in the Fenkell Avenue area near the Checkers Liquor Store.

53. On the morning of November 3, 2006, DPD officers canvassing the Fenkell Avenue neighborhood near the crimes encountered the 19-year-old Calhoun inside the Checkers Liquor Store on an errand to buy lottery tickets for his stepfather.

54. Despite the physical differences between Calhoun and *BH*'s description of her attacker, which were known to the DPD at the time, Defendant Officer Kane— who by then was a Sergeant in the DPD's SCU—advised the DPD police officers near the store to arrest Calhoun and bring him to the DPD's 16th precinct for questioning based solely on Calhoun's alleged resemblance to the composite sketch.

**Defendant Kane coerces and fabricates a false confession from Calhoun.**

55. Once at the DPD's 16th precinct station, the arresting DPD police officers immediately turned the 19-year-old Calhoun over to Defendant Kane. Defendant Kane took the young and disabled Calhoun—who had an IQ around 70 and (what was then described as) a "mild mental retardation," functioned at the level of a 10 to 12-year-old, received SSI Disability benefits and had graduated from the Central High School's Special Education Program the year before in 2005—and conducted an unrecorded interrogation without an attorney, guardian nor any witnesses present.

14

56. Defendant Kane then ignored Calhoun's repeated protestations of innocence and pressured him to confess. Defendant Kane also made false promises of leniency, including that if Calhoun confessed to assaulting *BH* he would spend the night at the precinct and then go home the next day.

57. Defendant Kane also threatened Calhoun, by words and/or actions, that if he did not confess police would hurt Calhoun or his family. Ultimately, Defendant Kane presented Calhoun with a handwritten confession in Q & A format, falsely indicating that Calhoun had confessed to committing at least four sexual assaults of young women, including the sexual assault of 13-year-old *BH*.

58. To make the false confession appear reliable, Defendant Kane inserted non-public details about the crime that only the true perpetrator or police would know. Worn down by Defendant's coercion, scared, alone and not understanding what was happening due to his cognitive disabilities, Calhoun acquiesced and signed the false confession.

59. Defendant Kane also presented Calhoun a "Constitutional Rights Certificate of Notification," in which the witness line is blank, and Defendant Kane wrote in the remarks section that allegedly Calhoun "states he can read + write English[.] He went to Central H.S. 2005 (12th)."

60. Nowhere in the aforementioned form does Defendant Kane mention Calhoun's visible cognitive disabilities, illiteracy, nor how the year before Calhoun had graduated from the Central H.S.'s program for children with special needs.

61. Defendant Kane then misrepresented that the details in the false confession originated with Calhoun when in fact they originated with the Defendant Officers, including Kane, and to explain the failure to video or audio record the interrogation, Kane falsely claimed the DPD lacked the capacity to do so.

**Defendants conduct a search of Calhoun's home while he is being interrogated and fabricate additional evidence to bolster Calhoun's false confession.**

62. While obtaining the coerced and fabricated confession, Defendant Kane directed other officers to search Calhoun's home for a gun used by *BH*'s assailant and a "long green coat . . . with a hood" that *BH* described her assailant as wearing.

63. Consistent with Calhoun's innocence, however, a thorough search of his home produce neither a gun nor the "long green coat … with a hood" *BH* had described. Although, DPD officers walked away with the closest thing they could find—a short green jacket with a full zip and thick stripes across the front—that they recognized did not match *BH*'s description of a long green coat worn by her attacker.

64. After DPD officers informed Defendant Kane their search at Calhoun's home had failed to come up with the long green coat with a hood, Defendant Kane misrepresented in the pre-authored false confession that Calhoun had stated he had

thrown the coat away before the officers showed up at this home to explain why a long green coat with a hood was not found during the officers' search, when in reality that search had occurred unknowingly to Calhoun at the time of his interrogation.

### Defendants use improper suggestion to fabricate false "identifications" of Calhoun.

65. After obtaining the false and fabricated confession, Defendants saw an opportunity to close another open sexual assault case: the September 26, 2006 assault of 15-year-old *MV*.

66. *MV* had described her then-unknown assailant to police as a 6'1" Black male, 20-25 years old, with "braids to the back" and a unique "puzzle piece" tattoo on his right arm.

67. Defendants knew that Calhoun, at 5'5", was close to a foot shorter and did not have any tattoos nor braids, and therefore did not match *MV*'s description of her assailant.

68. In fact, Ralph Douglass Tucker, a convicted repeat sex offender, currently serving time in Michigan prison since 2019 for other sexual assault convictions in Wayne County between 1999 and 2003, was the man who had attacked and tried to sexually assault *MV*.

69. In 2022, searches of national law enforcement databases by Wayne County prosecutors turned up only one individual with a puzzle tattoo on his arm—Ralph Douglass Tucker.

70. Rather than trying to locate the true perpetrator of the assault on *MV*, Defendants suppressed the fresh and initial description by *MV* and knowingly fabricated additional false evidence to pin the crime on Calhoun and close the *MV* file along with the *BH* file.

71. Even though Defendant Officer Jaskulka, who was assigned to both the *MV* and *BH* cases, had located eight possible suspects from the sex offender registry in the area matching the description *BH* provided, printed them out and intended to show these photo arrays, after the alleged "confession" the Defendants officers instead created a single photo array including only one suspect: Terance Calhoun.

72. The evening of the same day that Defendant Kane obtained the fabricated, false confession from Calhoun, on November 3, 2006, Defendants brought *MV* and *BH* into the precinct to view the single photo array. Defendants Kane and Ortiz used impermissible suggestion or other improper tactics to fabricate false "identifications" of Calhoun from *MV* and *BH*, although he was not the man either victim had seen and didn't physically resemble the true perpetrator of either crime.

73. Defendants then misreported that both victims had positively identified Calhoun's photograph without any pressure or suggestion.

74. Given the significant physical differences between Calhoun and each of the true perpetrators—including the 8-inch height difference between Calhoun and *MV*'s description of her assailant—without Defendants' suggestion neither victim would have identified Calhoun.

75. Defendant Kane then misreported that both *MV* and *BH* had positively identified Calhoun from live lineups without any pressure or suggestion.

**Defendants mislead prosecutors by covering up exculpatory DNA evidence.**

76. Instead of continuing to seriously investigate the cases, such as by seeking the actual perpetrator of the first crime (*MV*), i.e., the man with the braids and a puzzle tattoo, Defendant officers acted further to bolster the fabricated evidence by intentionally withholding forensic evidence that exonerated Calhoun.

77. On December 12, 2006, Defendant Ortiz submitted two types of evidence for forensic testing from the scene of the October 7, 2006, *BH* incident: the condom left by the actual perpetrator at the *BH* rape scene, and two rape kits.

78. On January 1, 2007, Defendant Ortiz, understanding the import of the forensic tests to the investigation, took a buccal swab from Calhoun and also submitted it for forensic testing.

79. Despite Defendants, including Ortiz and Kane, being aware of the pending forensic tests results, this testing information was withheld to push forward their botched investigation.

80. On February 15, 2007, a week before Calhoun's coerced false no-contest plea was entered, Defendant Ortiz arranged for Defendant Lieutenant Bilal R. Muhammad to conduct a polygraph examination to further cover up the false confession and other egregious misconduct throughout the investigation.

81. Upon information and belief, Defendant Muhammad's representations about the polygraph were false and then Calhoun's alleged incriminating statements made during a post-polygraph interview were fabricated by the Defendants as well.

**Calhoun enters a no-contest plea despite maintaining his innocence, describing his fear during the DPD interrogation and providing alibis during a forensic evaluation regarding his competency.**

82. On January 29, 2007, Calhoun was evaluated at the Center for Forensic Psychiatry for competency to waive his Miranda Rights and stand trial. In finding that Calhoun's waiver of Miranda rights was knowing and intelligent despite clinically describing Calhoun as "mildly mentally retarded," the evaluator specifically cited the fact that during the interrogation Calhoun had the presence of mind to recall and recount details to the police despite his obvious intellectual limitations. The evaluator also noted how Calhoun was "scared they was going to hurt me and my family" and "sad and disappointed…because my friend lied on me and put me in here."

83. On February 21, 2007, in a letter addressed to the attorneys in Calhoun's criminal case, the same evaluator wrote how Calhoun had "simply stated that he had

not committed these offenses and [was] innocent of the charges," explained that this was his first offense and that he had alibis for both incidents: on September 26, 2006 he was home the entire day and his mother could confirm this and on October 27, 2006 (a Friday) he had spent the entire weekend with his cousins.

84. As a direct result of Defendants' misconduct, despite being innocent, on February 21, 2007, Calhoun entered a plea of "no contest"—meaning that although he asserted his innocence, he purportedly acknowledged there was sufficient evidence to convict him—to: (1) Attempted Kidnapping in the case concerning *MV* under No. 06-013905-01-FC; and (2) First Degree CSC, Kidnapping and Felony possession of a firearm in the case concerning *BH* under No. 06-013904-FC.

85. On March 28, 2007, Calhoun was sentenced by the trial court in both cases: (1) in Case No. 06 013905-FC (victim *MV*) to a prison term of 11 months to 5 years; and (2) in Case No. 06-013904-FC (victim *BH*) to 15 to 30 years in prison for the First-Degree CSC conviction and the kidnapping conviction, which was set to run consecutive with a two-year sentence for the Felony Firearm count.

86. Just three months later, on June 15, 2007, Defendants received the DNA laboratory analysis from Reliagene Technologies Inc.

87. After analyzing the rape kits and condom collected at the scene within hours of the *BH*'s assault, and comparing it to Calhoun's buccal swab from January 2, 2007, Reliagene concluded that the DNA profile was consistent with a single-

male donor and that Calhoun was excluded as a match to that DNA profile.

88. The import of the DNA results was obvious—Calhoun was innocent and the detailed confession was false. Nor was it plausible that two teenagers would have accidentally identified the same wrong man absent police suggestion.

89. Defendant officers could not have failed to recognize their obligation to inform the prosecution, defense, and court of the exonerating DNA results. Nonetheless, Defendant officers—including Kane and Ortiz, and others overseeing the investigation, such as Tolbert—despite requesting and then being in possession of this exonerating evidence, knowingly withheld the DNA report from the prosecution, defense counsel, and Calhoun, who was wrongfully imprisoned.

90. Two months later, on September 10, 2007—and without any knowledge of the exonerating DNA results—Calhoun's criminal attorney withdrew the appeal of his conviction due to lack of viable issues, which would not have been the case but for Defendants' misconduct, including withholding the June 2007 report with the exonerating DNA results, which would have been a viable issue.

**The overwhelming evidence of Calhoun's actual innocence finally surfaces despite Kane's last-ditch effort to keep Calhoun wrongfully in prison.**

91. In 2019, per the Sexual Assault Kit Initiative (SAK), the Wayne County Prosecutor's Office was appointed to review the DNA testing on a backlog of rape kits, including relating to Calhoun's convictions.

92. Based on the 2007 lab report regarding Calhoun's case, the Wayne County

Prosecutor's Office notified the State Appellate Defender Office of Michigan (SADO) of the report, who then pursued independent testing of the condom.

93. Unsurprisingly, SADO confirmed through independent testing of the condom by Bode Technologies—a highly respected forensic laboratory—that Calhoun was excluded as being a male donor.

94. On April 28, 2020, SADO sent a summary of its findings regarding Calhoun's innocence of the second assault to the Wayne County Prosecutor's Office CIU, which made a strong recommendation that his conviction be vacated.

95.  On January 21, 2022, the CIU notified SADO that a national search for a puzzle piece tattoo returned one person: Ralph Douglass Tucker, who has been in prison in Michigan since he was sentenced in September 2019 for multiple sex crimes in Wayne County spanning from August 1999 to April 2003.

96. Finally, in 2022, SADO and the Wayne County Prosecutor's Office petitioned the Wayne County Circuit Court to dismiss both of Calhoun's convictions based on his actual innocence.

97. The court agreed to hear the innocence motion and scheduled a hearing for April 22, 2022.

98. On April 22, 2022, however, Defendant Kane, acting under color of law, improperly approached Judge Kelly Ramsey in the courtroom of the Wayne County Circuit Court in an attempt to bring what he falsely claimed to be "new information"

about the case to the attention of the court.

99. Defendant Kane's actions on that day in court were another clear and separate unlawful attempt to continue to thwart Calhoun's pursuit of justice and further evidence of his efforts to conceal and prevent the public disclosure of the unconstitutional misconduct pursuant to the customs, policies, and practices of the City of Detroit DPD, including ratification of the concealment and failure to disclose exculpatory evidence, and the fabrication of inculpatory "evidence."

100. As a proximate result of this false and corrupt action by Defendant Kane, acting on behalf of himself and the other Defendants herein, Calhoun's hearing to dismiss his case was adjourned another five days, thereby extending his false imprisonment and enhancing his damages.

101. On April 27, 2022, the hearing was held, and Calhoun's conviction was immediately dismissed. Calhoun—finally, after 15 years—was exonerated and released from prison.

## **DAMAGES**

102. Defendants' actions deprived Terance Calhoun of his civil rights under the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution.

103. This action seeks damages for the period from November 3, 2006 through each and every year to the present, and into the future.

104. Calhoun's liberty was curtailed upon his arrest on November 3, 2006 and

continued for the duration of his wrongful incarceration until his release on April 27, 2022.

105. Defendants' unlawful, intentional, willful, deliberately indifferent, reckless, and/or bad-faith acts and omissions caused Calhoun to be falsely arrested, tried, wrongfully convicted and incarcerated for over 15 years for crimes he did not commit.

106. Defendants unlawful, intentional, willful, deliberately indifferent, reckless, and/or bad-faith acts and omissions caused Calhoun the following injuries and damages, which continue to date and will continue into the future:

    a.  personal and physical injuries;

    b.  pain and suffering;

    c.  severe mental anguish, emotional distress;

    d.  loss of family relationships;

    e.  severe psychological damage;

    f.  damage to business and property;

    g.  legal expenses;

    h.  loss of income;

    i.  infliction of physical illness; inadequate medical care;

    j.  humiliation, indignities and embarrassment;

k.  degradation; permanent loss of natural psychological development; and

l.  restrictions on all forms of personal freedom including but not limited to diet, sleep, personal contact, educational opportunity, vocational opportunity, athletic opportunity, personal fulfillment, sexual activity, family relations, reading, television, movies, travel, enjoyment, and expression,

for all of which he is entitled monetary relief.

107. The conduct of Defendants was reckless and outrageous, entitling Plaintiff to an award of punitive damages from any and all the individual Defendants, herein, as well as costs and reasonable attorney fees, pursuant to 42 U.S.C. § 1988.

## CLAIMS FOR RELIEF
## FEDERAL CAUSES OF ACTION

### COUNT I
### 42 U.S.C. § 1983 FOURTEENTH AMENDMENT VIOLATIONS:
### Deprivation of Liberty Without Due Process of Law and Denial of a Fair Trial

108. Plaintiff hereby incorporates by reference all of the foregoing and further alleges as follows:

109.  All the acts and omissions committed by Defendants were done intentionally, recklessly, deliberately, outrageously and/or in bad faith, so as to entitle the Plaintiff to both compensatory and punitive damages.

26

110. Defendants acting deliberately, recklessly, or intentionally and under color of law, fabricated statements, including without limitation admissions allegedly attributable to Terance Calhoun and others, in police reports and in testimony during pretrial proceedings, thereby violating his right to a fair trial and causing him to be deprived of his liberty without due process of law.

111. Defendants further caused the false evidence to be used against Calhoun, resulting in his wrongful prosecution, conviction, imprisonment, and waiver of his appeal.

112. As a direct and proximate result of individual Defendants' fabrication of this false inculpatory evidence, violating Calhoun's clearly established Fourteenth Amendment due process rights, including the right to a fair trial, along with his Fourth Amendment right to due process of law, Calhoun was wrongfully convicted, falsely imprisoned, and suffered the injuries and damages described above.

113. Defendants, all state actors, acting deliberately, recklessly, and/or intentionally and under color of law, failed to document or disclose to the Wayne County Prosecutor's Office and/or to the Wayne County Circuit Court, material exculpatory and impeachment information including, without limitation, that Defendant officers used impermissible suggestion and/or other improper tactics with eyewitnesses, made misrepresentations about the confession and hid exculpatory forensic evidence, including during the pretrial proceedings and thereafter

27

concerning the precise details of the crime.

114. By failing to disclose this information, Defendant police officers and Defendant City violated the Fourteenth Amendment, as clearly announced by *Brady v. Maryland*, 373 U.S. 83 (1963), *Napue v. Illinois*, 360 U.S. 264 (1959), *Pyle v. Kansas*, 317 U.S. 213 (1942), and its progeny, which imposed a clear duty on the Defendants not to conceal or suppress exculpatory evidence, and rather to report all material exculpatory and impeachment information to prosecutors and the defense.

115. Acting with recklessness, deliberate indifference, and/or intentionally by withholding this material exculpatory and impeachment evidence prior to, during, and after the plea, Defendants, including Kane and Ortiz, violated Calhoun's clearly established Fourteenth Amendment right to due process of law as announced by the United States Supreme Court in *Brady v. Maryland* and its progeny, undermining confidence in the outcome of the trial, and directly and proximately causing Calhoun to be wrongfully convicted and to suffer the constitutional violations, injuries and damages described above.

116. Defendants, including Kane, deliberately, recklessly, or intentionally, and under color of law further violated Calhoun's Fourteenth Amendment right to a fair trial by compelling, manipulating and coercing him to make false inculpatory statements that repeated details of the crime that they had fed him.

117. By falsely concealing the compulsion, concealment, and coercion

28

through which these statements were obtained and falsely testifying regarding those circumstances, Defendants' actions led to the introduction into evidence of those statements, thus violating Calhoun's Fourteenth Amendment right to a fair trial, which bars introduction of statements obtained by use of means that violate Calhoun's Fifth Amendment right to be free from compelled self-incrimination.

118. The actions of these Defendants violated Calhoun's clearly established rights under the procedural due process component of the Fourteenth Amendment and caused his wrongful conviction and the injuries and damages set forth above.

**COUNT II**
**42 U.S.C. § 1983 FOURTH AND FOURTEENTH AMENDMENT**
**VIOLATIONS: Malicious Prosecution**

119. Plaintiff hereby incorporates by reference all of the foregoing and further alleges as follows:

120. Defendants acting deliberately, recklessly and under color of law, falsely arrested and imprisoned Plaintiff, without probable cause or other legal justification, knowing that there was no reliable evidence connecting Plaintiff with the crime; and they then fabricated statements including false admissions attributed to Plaintiff in police reports and in testimony, such as during pretrial proceedings, and thereafter, including Kane during the post-conviction hearing, concerning the precise details of the crime, all the while knowing Plaintiff was innocent of any crime. Therefore, there was not even arguable probable cause to arrest or prosecute Plaintiff and no

reasonable officer would have believed probable cause existed.

121. Defendants acting under color of law, commenced and/or caused to be continued a criminal prosecution against Plaintiff that was lacking in probable cause, unreasonably instituted, by suppressing exculpatory evidence, fabricating and coercing a false confession, using impermissible suggestion and/or other improper tactics with eyewitnesses, and failing to adequately investigate the crime and disregarding evidence indicating that Plaintiff was innocent.

122. The prosecution of Plaintiff ultimately terminated in his favor when his indictment was dismissed in post-conviction proceedings on April 27, 2022.

123. The actions of Defendants violated Plaintiff's clearly established Fourth and Fourteenth Amendment rights to be free from unreasonable seizure and thereby caused his wrongful conviction and the injuries and damages set forth above.

## **COUNT III**
### **42 U.S.C. § 1983 Failure to Intervene**

124. Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

125. In the manner described above, by their conduct and under color of law, during the constitutional violations described herein, one or more of the Defendant Officers stood by without intervening to prevent the violation of Plaintiff's constitutional rights even though they had the opportunity and duty to do so.

126. The Defendant Officers' actions and omissions in the face of a constitutional duty to intervene were the direct and proximate cause of Plaintiff's constitutional violations and injuries, including but not limited to loss of liberty, physical harm and emotional distress.

127. The actions of these Defendants violated Plaintiff's clearly established Fourth and Fourteenth Amendment rights to be free from unreasonable seizure and thereby caused his wrongful conviction and the injuries and damages set forth above.

## COUNT IV
### 42 U.S.C. § 1983 Supervisor Liability Claim

128. Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

129. Defendant Ortiz was the officer in charge of the investigation and prosecution of Mr. Calhoun. Defendant Kane was a sergeant and supervisor in the DPD's Sex Crimes Unit and was personally involved in overseeing this case. Defendant Tolbert was a commander and supervisor in the DPD's Major Crimes Division and was also personally involved in overseeing this case. Defendant Bilal Muhammad was a lieutenant and supervisor and also personally involved in overseeing this case.

130. Supervisory Defendants Ortiz, Kane, Tolbert, and Bilal gave direct orders causing the violation of Plaintiff's constitutional rights and/or encouraged or

knowingly approved of the actions of other officers under their authority in their actions that violated Plaintiff's constitutional rights.

131. The actions of these supervisory Defendants, in their supervisory capacity, violated Plaintiff's clearly established Fourth and Fourteenth Amendment rights to be free from unreasonable seizure and thereby caused his wrongful conviction and the injuries and damages set forth above.

## COUNT V
### 42 U.S.C. § 1983 Conspiracy to Deprive Constitutional Rights

132. Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

133. The Defendant Officers, acting within the scope of their employment and under color of law, agreed among themselves and with other individuals to act in concert in order to deprive Mr. Calhoun of his constitutional rights, including his rights to due process, all as described in the preceding paragraphs of this Complaint.

134. In this manner, the Defendant Officers, acting in concert with other unknown coconspirators, conspired by concerted action to accomplish an unlawful purpose by unlawful means.

135. In furtherance of the conspiracy, each of the coconspirators engaged in and facilitated overt acts, including but not limited to those set forth above—such as fabricating and withholding evidence—and was an otherwise willful participant in

joint activity.

136. As a direct and proximate result of the illicit prior agreement and actions in furtherance of the conspiracy referenced above, Plaintiff's rights were violated, and he suffered injuries, including but not limited to loss of liberty, physical harm, and severe emotional distress.

137. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice and willful indifference to Plaintiff's clearly established constitutional rights.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff Terance Calhoun respectfully requests:

a. A trial by jury on each of the Plaintiff's claims;

b. That the Court award compensatory damages to Plaintiff and against all Defendants, jointly and severally, in an amount to be determined at trial;

c. That the Court award punitive damages to Plaintiff, and against individual Officer Defendants, in an amount to be determined at trial, in order to deter such conduct by Officer Defendants in the future;

d. For pre-judgment and post-judgment interest and recovery of costs, including reasonable attorneys' fees pursuant to 42 U.S.C. § 1988 for all 42 U.S.C. § 1983 claims; and

e. For any and all other relief to which he may be entitled.

## **JURY DEMAND**

Plaintiff, TERANCE CALHOUN, by and through his legal conservators, Octavia Monroe and Theodore W. Goodman, and by and through his attorneys, the law firms of Neufeld Scheck, Brustin, Hoffmann & Freudenberger, LLP, and Goodman Hurwitz & James, P.C., hereby demands a trial by jury on all issues of this action.

DATED: January 24, 2024                     Respectfully submitted,

**Neufeld Scheck Brustin Hoffmann & Freudenberger, LLP**

/s/ Emma Freudenberger
Emma Freudenberger
Amelia Green
Rhianna Rey
Elsa Mota
99 Hudson Street
New York, New York 10013
(212) 965-9081

**Goodman Hurwitz & James, P.C.**

/s/ Kathryn Bruner James
Kathryn Bruner James (P71374)
Julie H. Hurwitz (P34720)
Huwaida Arraf (NY 4707220)
1394 E. Jefferson Ave,
Detroit, Michigan 48207
(313) 567-6170

*Attorneys for Plaintiff*

34