UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

TERANCE CALHOUN

        Plaintiff,

v.

                                          Case No. 24-cv-10184
                                          HON. MARK A. GOLDSMITH

ROBERT KANE, et al.,

        Defendants.

_____/

**<u>ORDER GRANTING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY
JUDGMENT (Dkt. 97) AND GRANTING IN PART AND DENYING IN PART
DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS AND FOR
SUMMARY JUDGMENT (Dkt. 106)</u>**

This is a wrongful conviction action, whose roots go back to 2007, when Plaintiff Terance

Calhoun, then 19 years old, pleaded nolo contendre in two separate sexual assault cases. In 2022,

after he had served over 15 years in prison, Calhoun's convictions and sentences were vacated and

the charges against him were dismissed with prejudice by stipulated order in state court.

Defendants Jose Ortiz, Robert Kane, and Bilal Muhammad were Detroit Police Department

(DPD) officers who participated in the investigation and prosecution of Calhoun's 2007 cases.[1]

Ortiz was the officer in charge of the investigation into both assaults. Ortiz and Kane were both

police officers in the DPD sex crimes unit. Muhammad was an officer in the DPD crime lab and

he conducted a polygraph examination of Calhoun during the investigation.

---

[1] Now a sergeant with the DPD, Ortiz was an investigator in the sex crimes unit in 2006–2007.
<u>See</u> Kane Dep. Tr. at PageID.3522 (Dkt. 118-14). Kane was also an investigator in 2006–2007,
and later became a detective before retiring from DPD in 2022. <u>See</u> Ortiz Dep. Tr. at PageID.3445
(Dkt. 118-10). Muhammad, a lieutenant in 2006–2007, was the highest-ranking officer in the DPD
crime lab and the DPD's polygraph examiner at the time of Calhoun's investigation and
prosecution. <u>See</u> Muhammad Dep. Tr. at PageID.4145–4146 (Dkt. 118-38).

The claims Calhoun brings against Defendants in this case allege that they improperly: (i) suppressed exculpatory DNA evidence, Pl. Resp. at PageID.3216–3223; (ii) coerced his confession, id. at PageID.3202–3207; (iii) impermissibly suggested his identification in a photo line-up, id. at PageID.3207–3213; and (iv) fabricated incriminating statements during a polygraph examination, id. at PageID.3250–3251.

Before the Court are (i) Calhoun's motion for partial summary judgment (Dkt. 97) and (ii) Defendants' motion for judgment on the pleadings and for summary judgment (Dkt. 106). Calhoun's motion seeks partial summary judgment on a single issue— that Calhoun's claims are not barred by the doctrine announced in Heck v. Humphrey, 512 U.S. 477 (1994).  Defendants' motion raises the Heck issue, Defs. Mot. at PageID.1841–1843, and several other arguments:

> (i)  Collateral estoppel bars Calhoun from relitigating claims on which the state court previously ruled, id. at PageID.1843–1844.
>
> (ii)  Calhoun's decision to plead nolo contendre in the state court proceeding bars him from making any claim that Defendants violated his constitutional rights and is the proximate cause of his convictions, id. at PageID.1844–1848.
>
> (iii)  Defendants are entitled to qualified immunity on some of Calhoun's claims, specifically: suppression of evidence, coerced and fabricated confessions, and improperly suggestive photo lineup, id. at PageID.1848–1869.
>
> (iv)  The evidence regarding the alleged "real perpetrators" was not available until 2019, id. at PageID.1869–1871.[2]
>
> (v)  Calhoun cannot establish a fabricated polygraph claim, id. at PageID.1871–1872.

For the reasons that follow, the Court grants Calhoun's motion for partial summary judgment and grants in part and denies in part Defendants' motion.[3]

---

[2] As explained below, this argument is unclear.

[3] Because oral argument will not aid the Court's decisional process, the motion will be decided based on the parties' briefing.  See E.D. Mich. LR 7.1(f)(2); Fed. R. Civ. P. 78(b).  In addition to

## I.   BACKGROUND

### A.   Sexual Assaults

Calhoun's case arises out of two separate sexual assaults that occurred in the City of Detroit in 2006 against two teenage girls, MV and BH.  The first attack occurred on September 26, 2006, and involved MV, a 15 year-old girl.  MV Stmt. at PageID.3302 (Dkt. 118-3).  MV was on her way home from school at approximately 4:00 p.m. when her assailant approached her and told her he wanted to show her something and kiss her.  Id.  She tried to walk away but he grabbed her arm and started pulling her into an alley.  Id.  When he "flung[]" her into the alley, she managed to escape and run home.  Id.  MV described her attacker as a Black male, between ages 20–25, 6'1" in height with his hair in "braids" and a "puzzle piece tattoo" on his right arm.  Id.  No physical evidence was recovered from this attack.  4/21/22 Order of Stip. Facts at PageID.2001–2003 (Dkt. 106–27).[4]

The second attack occurred on October 27, 2006 and involved 13 year-old victim BH.  BH Stmt. at PageID.3326 (Dkt. 118-9).  BH reported that she was walking to the bus stop at approximately 7:30 a.m., when her assailant approached her and held a gun to her back.  Id.  The assailant forced BH to walk to an alley behind the Checkers Liquor Store, where he put on a condom and unsuccessfully attempted to penetrate her anally.  Id.  He then removed the condom, forced BH to perform oral sex on him and ejaculated in her mouth.  Id. at PageID.3327.  He threatened he would kill her if she told anybody, saying he knew where she lived.  Id.

---

Calhoun's motion, Defendants filed a response (Dkt. 110) and Calhoun filed a reply brief (Dkt. 116).  In addition to Defendants' motion, Calhoun filed a response (Dkt. 118) and Defendants filed a reply brief (Dkt. 122).

[4] The 4/21/22 Order of Stipulated Facts was entered in two state criminal cases: Wayne County Circuit Case No. 06-013904 and No. 06-013905.  This Order set forth stipulated findings of fact, vacated Calhoun's convictions, and dismissed the cases with prejudice.

BH ran home and reported the incident to her mother and brother.  Id.  She reported the attack to police at approximately 10:37 a.m. on the same day it occurred.  DPD Incident Rpt. (BH) at PageID.3305 (Dkt. 118-4).  BH described her attacker to the police as a Black male, wearing a green coat, between 25 or 26 years old, approximately 5'8" to 5'10" in height, medium build, and carrying a gun.  See Jaskulka Dep. Tr. at PageID.3834–3835 (Dkt. 118-24).  A DPD sketch artist created a composite sketch based on BH's description of the assailant, which was released to the media.  See Defs. Stmt. of Material Facts (DSOMF) at ¶¶ 4–5 (Dkt. 106).

### B. Condom Recovered from Scene of BH Attack

The DPD evidence technician report indicates that at approximately 1:30 p.m. to 2:15 p.m. (about three hours after BH reported the attack to the police) Ortiz requested that DPD evidence technicians retrieve a used condom from the alley where the BH assault had occurred.  Evid. Tech. Rpt. at PageID.3278 (Dkt. 118-11).  The condom was delivered to DPD's forensic laboratory.  Id.  On December 12, 2006, the forensic lab sent the condom to a company called Reliagene Technologies for DNA testing.  Lab Req. at PageID.4444 (Dkt. 118-58).

A later-issued Reliagene report indicated that Calhoun was not the donor of the DNA on the condom.  See 2007 DNA Report (Dkt. 118-16).  However, as discussed in further detail below, the report was not issued until June 2007—months after Calhoun was already serving a prison sentence for both assaults.  Id.  Whether Defendants knew about the report shortly after it was issued is a key issue underlying Calhoun's claims and is discussed further below.

### C. Arrest

On the morning of November 3, 2006, Calhoun was at Checkers Liquor Store playing the lottery for his stepfather.  Calhoun Dep. Tr. at PageID.3872 (Dkt. 118-27).  Three DPD officers, Ryan Connor, Leroy Huelsenbeck, and Kelly Lucy, who were on a routine patrol, learned that "a

person matching the description of a [criminal sexual conduct] perp was at Checkers Liquor Store."[5]   11/3/06 Arrest Rpt. No. 0611030335.2 at PageID.1908 (Dkt. 106-9) (punctuation modified).  The three officers arrived at Checkers Liquor Store, observed Calhoun, and, believing that he looked like the perpetrator depicted in the composite sketch of BH's attacker, arrested him. Id.; see also R. Connor Aff. at ¶¶ 4–5 (Dkt. 106-39); see also Prelim. Exam. Tr. at PageID.3286 (Dkt. 106-18); 4/21/22 Order of Stip. Facts at PageID.2002.  The arresting officers called the DPD sex crimes unit to inform them of the arrest.  R. Connor Aff. at ¶ 7.  Kane answered the telephone and advised the officers to transport Calhoun to the sex crimes unit.[6] Id.

### D. Interrogation and Confession

Kane conducted Calhoun's interrogation.  Prelim. Exam. Tr. at PageID.3286.  Kane testified that he was trained to document the questions he asked of Calhoun and Calhoun's responses, verbatim, during an interrogation.  Kane Dep. Tr. at PageID.2578–2579.  Kane took down Calhoun's statement on a document entitled "Defendant's Statements."  Calhoun Stmt. at PageID.4195–4198 (Dkt. 118-40).  Calhoun initialed and signed the statement, which the parties refer to as Calhoun's confession.  Id.

Though Calhoun's confession does not admit to attacking BH or MV specifically, he does admit to forcing several girls to perform oral sex on him around the same time that BH was attacked.  See id.  In the confession, Calhoun provided the following details:

- He often went to Checkers Liquor Store to "play[] numbers for my step daddy" and that, while there, he "talk[s] to girls."  Id. at PageID.4195.

---

[5] Calhoun's arrest report indicates that the officers learned of this tip from another officer named Overton.  11/3/06 Arrest Rpt. No. 0611030335.2 at PageID.1908.  The report does not provide further details.  Nor does Connor's affidavit provide any more context about the tip or Overton.

[6] There is no indication that any of the other Defendants, besides Kane, were aware of the arrest or otherwise involved in Calhoun's arrest and transportation to the police station.

- While visiting Checkers, he talked to girls "about getting some head (oral sex)."[7] Id.

- Just the day before his arrest, at 4:30 p.m., a "girl named Dominique" performed oral sex on him. Id. Calhoun described that they went "behind the Coney Island down the street from Checkers." Id.

- When Kane asked Calhoun if he ever forced any of the girls to give him oral sex, Calhoun responded "Yea, a couple of days ago and last week." Id.

- Kane asked Calhoun for more information about the incident that occurred last week. Id. Calhoun stated that it occurred in the morning, "about 7:00am" and that the girl was "at the bus stop at Checkers" when he approached her. Id. at PageID.4196. He asked the girl her name and asked if she wanted to go for a walk. Id. Calhoun stated "she said yea, we went to this field near this day care center," where he asked the girl for oral sex. Id.

- When the girl said no, Calhoun said, "I then choked her up around her neck with my hands. I told her if she don't give it to me, I'm going to take it. She said ok, I'll give you some head, don't choke me no more. She gave me some head and I busted (ejaculated) in her mouth, I left and then she left." Id.

- Kane asked Calhoun if he did anything else to the girl and he stated: "After I busted (ejaculated) I called her back, I told her to bend over, I tried to stick my penis in her butt but it wouldn't go in. I just left after that." Id.

- Kane asked Calhoun "Did you put a condom on before you tried to stick it in her butt?" to which Calhoun stated "Yea." Id.

- Kane asked Calhoun "What else did you say to the girl?" and Calhoun responded, "I told her not to tell nobody, I told her if she tells somebody, I'm going to have somebody kill her." Id.

- Calhoun denied having either a gun or weapons with him during the attack. Id.

- Calhoun said he wore a green coat, which he later threw out when he "saw a wanted picture in the store" with a coat that resembled his. Id.

- When Kane asked Calhoun "Did you force any other girls to give you head?" He stated "Yes. All together, four girls, around last Monday at around 4:00/5:00p, I forced a girl to give me some head." Id. at PageID.4197.

- Regarding the Monday incident, Calhoun stated "The girl was waiting at a bus stop I was walking down the street, I stopped to talk to her, I told her to give me some

---

[7] The parenthetical language contained in these bullet points was the language used in the confession.

head or I was going to punch her.  I took her behind this building a [sic] apartment building.  I grabbed her by the hair and told her to give me some head.  She gave me some head.  I busted in her mouth and I left, she left to catch the bus." Id.

- Calhoun again denied having a weapon during this encounter.  Id.

- Kane then asked, "I want to ask you again, did you have a weapon real or fake," to which Calhoun responded: "I had a fake gun." Id.  He said that he used the fake gun "on the girls." Id.

- Calhoun said he gave the gun to "my friend Damon" because he "didn't want to get blamed for it." Id. at PageID.4197–4198.

Calhoun now says that he did not understand the confession he signed.  Calhoun Dep. Tr. at PageID.3881.  The parties dispute whether Calhoun could in fact read and write English.  See DSOMF at ¶ 8; Pl. Counter-Stmt. of Material Facts (PCSOMF) at ¶ 8 (Dkt. 118).  Calhoun states that his cognitive ability is "within the Exceptionally Low Range," and his full-scale IQ falls below the 1st percentile.  C. Vega Expert Rpt. at PageID.3932–3933 (Dkt. 118-30).  He argues that Kane told him that (i) if he did not confess, Kane would make Calhoun's life worse than it already was, and (ii) if he confessed to assaulting BH, he would be able to go home the next day.  See Calhoun Dep. Tr. at PageID.3875–3877.  Calhoun argues that Kane took advantage of his low cognitive ability, and, based on Kane's threats and false promises, induced Calhoun to sign a confession he did not fully understand.  Pl. Resp. at PageID.3205.

Kane denies that he coerced the confession.  Kane Dep. Tr. at PageID.3563–3565.  In his deposition, Kane denied ever threatening Calhoun.  Id. at PageID.3564.  He denied using, during the interrogation, "words that in any way could have caused [Calhoun] to fear harm to him or his family." Id.  He also denied telling Calhoun that if he confessed, he could go home.  Id.

Kane confirmed that he understood the importance of conducting a careful examination of a person with an intellectual disability because they are more susceptible to giving false confessions.  Id.  However, Kane understood Calhoun to be at least of ordinary intelligence and

did not observe any indications that Calhoun could not read or write.  Id. at PageID.3610–3611.

He states that he saw no sign of intellectual limitations, and that he would have recognized those

limitations if Calhoun had them.  Id. at PageID.3565.

### E.      Photo Identification

Kane and Ortiz arranged a photo line-up using six photos, including one of Calhoun.  DPD

Photo ID Record at PageID.4463–4464 (Dkt. 118-65); Kane Dep. Tr. at PageID.3602–3603; Ortiz

Dep. Tr. at PageID.3370–3374.  On November 3, 2006—the same day as Calhoun's arrest—BH

and MV separately identified Calhoun in the photo array as their assailant.  DPD Photo ID Record

at PageID.4463–4464.  Calhoun alleges that Ortiz improperly suggested to MV and BH whom

they should select in the photo array, and that their resulting identifications of him were fabricated.

Pl. Resp. at PageID.3233–3236.  Calhoun argues that the following facts support his assertion.

First, he points to "major discrepancies" between Calhoun's appearance and the

descriptions that MV and BH gave of their perpetrators.  Specifically, Calhoun was 19 years old,

had no tattoos, no braids, was 5'5" in height, and weighed approximately 125 pounds.  MDOC

Med. Intake Form at PageID.3963 (Dkt. 118-33).  MV described her attacker as between ages 20–

25, 6'1" in height, as having his hair in "braids" and having a "puzzle piece tattoo" on his right

arm.  MV Stmt. at PageID.3302.  BH described her assailant as between ages 25–26, 5'8" to 5'10"

in height, and medium build.  BH Stmt. at PageID.3326.  Calhoun is not a match to either

description.

Second, Calhoun argues that the descriptions of MV and BH's perpetrators were

inconsistent with each other, which indicates that the same perpetrator did not commit both crimes.

Pl. Resp. at PageID.3208.

Third, he points to Ortiz's testimony that a photo array is a less reliable and accurate identification procedure than a live lineup. Ortiz Dep. Tr. at PageID.3415–3416. He argues that a live lineup could—and should—have occurred here because Calhoun was in custody at the time. Pl. Resp. at PageID.3212. Instead, the identifications were made from a photo "which doesn't show height, weight, or tattoos." Id. at PageID.3234.

Ortiz testified that he did not recall specifically why a live lineup was not conducted in this case. Ortiz Dep. Tr. at PageID.3415–3416. He speculated that the reason was likely because the county generally needed 48-hours-notice to arrange a live lineup, but a photo array could be conducted without delay. Id. Ortiz testified that he would have wanted an identification included in his warrant report. Id. at 3416–3417. Because the photo array was conducted on November 3, 2006—the same evening he typed up Calhoun's warrant—timing was the likely reason why a live lineup did not occur. Id.

Fourth, Calhoun points to Ortiz's testimony that young sex crime victims can be particularly susceptible to outside influence or suggestion because police can exude inherent authority. Ortiz Dep. Tr. at PageID.3337. Based on his knowledge of this fact, and because MV was 15 years old and BH was 13 years old, Calhoun argues, a live lineup would have resulted in greater accuracy. See Pl. Resp. at PageID.3209. He believes that, based on MV and BH's young ages, and the fact that, if Calhoun is innocent, neither BH nor MV were likely to both coincidentally identify him, a jury could infer that Defendants improperly made suggestions to MV and BH at the photo lineup. Id.

Fifth, Calhoun argues that, in two unrelated cases, Ortiz has been accused of fabricating identifications by "telling witnesses ahead of time which position the police suspect will be in and telling them to simply pick the person in that position." Id. at PageID.3210 (citing Mullins v.

9

McKee, No. 11-cv-14678, 2018 WL 339899, at *7 (E.D. Mich. Jan 9, 2018); People v. Anthony, No. 300212, 2013 WL 2494982, at *7 (Mich. Ct. App. June 11, 2013)).  Calhoun argues that Ortiz did the same thing here.  Id.

Ortiz denies these allegations.  Ortiz Dep. Tr. at PageID.3408–3410.  He testified that he understood that it would be improper to tell a victim in an identification that the suspect was in one of the photos in the lineup.  Id. at PageID.3337–3338.  He testified that he understood it would be improper to tell a witness which individual to choose in a lineup.  Id. at PageID.3338–3339.  He also testified that, at no point in his career had he ever told a victim or witness that he knew who did it, nor had he ever given them the photo number of the suspect to identify in a lineup.  Id.

Ortiz cites to the testimony of attorney Daniel J. Finwall, who witnessed the photo identification.  DPD Photo ID Record at PageID.4463–4464.  Finwall worked as an on-call attorney who witnessed photo identifications conducted by DPD to ensure they were conducted properly.  Id. at PageID.4323–4325.  In his deposition, Finwall testified that he did not recall this case specifically, but his sign-off on the identifications indicated he did not find anything improper about the way the photo lineup was conducted.  Finwall Dep. Tr. at PageID.1931 (Dkt. 106-14).

### F.    Preliminary Examination

Calhoun's preliminary examination was held on November 30, 2006.  See Prelim. Exam. Tr.  Both MV and BH testified about their attacks at the hearing.  Id.

MV testified that she did not get a chance to see her attacker's face when he initially called out to her, and that she was walking away from him during the incident.  Id. at PageID.3280–3281.  She testified her attacker never got close enough to kiss her, even though that was what he initially told her he wanted to do.  Id. at PageID.3284.  Calhoun argues that this evidence supports his

10

position that MV could not have identified him as her attacker because she never got a good look at him.

BH, on the other hand, testified that she did get a good look at her attacker's face, and she confirmed that she described her attacker to a sketch artist.  Id. at PageID.3275–3276.  Both MV and BH identified Calhoun as the perpetrator at the preliminary examination.  Id. at PageID.3281 (MV's identification of Calhoun); id. at PageID.3274 (BH's identification of Calhoun).

### G.   Competency Evaluation

After the preliminary examination, Calhoun was evaluated for competency to determine his ability to waive his Miranda rights and stand trial.  See 2/21/07 Competency Ltr. PageID.4200–4205 (Dkt. 118-41).  The evaluation report concluded that Calhoun had "intellectual limitations."  Id. at PageID.4201.  It explained that, even though Calhoun graduated from high school, he "was in special education throughout school," and that his "ability to read and write [was] minimal."  Id.

The report indicates that one of the tests administered—the WASI standardized test of intellectual functioning—placed him "in the mildly mentally retarded range."  Id.  The report further stated, in relevant part:

> Most significant in the defendant's clinical presentation were his obvious intellectual limitations.  As already noted, he was in special education throughout school and had intellectual testing consistent with mild mental retardation.  The defendant was asked about some of his daily activities, which also reflected abilities consistent with mild retardation.  For example, he does not possess a driver's license . . . He understands the concept of money and how to use it.  It is difficult, however, for him to do the mental arithmetic required to calculate how much change he might receive when making a simple purchase.

Id. at PageID.4202.

Regarding his written confession, Calhoun told the evaluator: "Yeah I wrote a statement, but the statement is not true."  Id. at PageID.4202–4203.  He explained that he confessed because he was scared that the police would hurt him and his family.  Id.

11

The evaluator found Calhoun competent to waive his <u>Miranda</u> rights and stand trial. <u>Id.</u> at PageID.4205.

## H. Polygraph

Calhoun's counsel requested a court-ordered polygraph, which Muhammad administered on February 15, 2007. <u>See</u> Polygraph Order at PageID.1971 (Dkt. 106-20); <u>see also</u> Polygraph Rpt. at PageID.1981 (Dkt. 106-22). The report indicates that Calhoun denied all four questions posed during the exam. Polygraph Rpt. at PageID.1981. The four questions were:

1. Did you know who forced that girl to suck his penis?
2. Did you force that girl to suck your penis?
3. Did you put a gun in that girls [sic] back?
4. Did you try to put your penis in that girls [sic] butt?

<u>Id.</u>

The report concluded that Calhoun was "not being truthful" during his examination. <u>Id.</u> The report also contained the following:

Post Test Interview:

During the post test interview Mr. Calhoun stated that he would like to get some help to control his strong needs to have sex. Mr. Calhoun stated that in the past he has been able to control his sexual needs by playing sports or video games, however these activities no longer delay his need to satisfy his sexual desires. Mr. Calhoun further stated that each time he has forced someone to have sex with him he feels sorry that it happened.

<u>Id.</u>

Calhoun argues that Muhammad fabricated these post-interview statements and denies making them. PCSOMF at ¶ 17; Pl. Stmt. of Additional Material Facts (PSOAMF) ¶¶ 75–80 (Dkt. 118). He argues that Muhammad's fabrication is evidenced by the fact that Muhammad asked no follow up questions about this statement. PSOAMF at ¶¶ 75–80.

12

Muhammad denies that he fabricated Calhoun's post-interview statements. Muhammad Dep. Tr. at PageID.4171–4173; 4179. Muhammad also did not recall Calhoun's polygraph, specifically, but he stood by the accuracy of what he put in his report. Id. at PageID.4172.

### I.      Plea and Sentence

On February 21, 2007, Calhoun pleaded nolo contendre to the assaults on BH and MV. See Plea Hr'g Tr. at PageID.4270–4305 (Dkt. 118-44). On March 28, 2007, he was sentenced for both crimes. For the MV incident, Calhoun was sentenced to 11 months to 5 years on attempted kidnapping under Mich. Comp. Laws §§ 750.349 and 750.92. Jgt. Wayne County Case No. 06-013905 at PageID.4385 (Dkt. 118-52). For the BH incident, he was sentenced to 15–30 years for criminal sexual assault with a weapon under Mich. Comp. Laws § 750.520(b)(1)(e), 15–30 years for kidnapping under Mich. Comp. Laws § 750.349, and 2 years for felony firearm under Mich. Comp. Laws § 750.227. Jgt. Wayne County Case No. 06-013904 at PageID.4381 (Dkt. 118-51). The judgment in the BH case states: "Cts 1 & 2 run concurrent but consecutive to ct 3; runs concurrent w/ case #06-013905 [the MV case]" Id.

Calhoun was appointed appellate counsel on April 8, 2007. Calhoun Aff. Dism. Appeal at PageID.2015 (Dkt. 106-31). On September 8, 2007, Calhoun signed an affidavit stating his counsel advised him that, after reviewing his file (including the plea and sentencing transcripts), he had no viable grounds for an appeal. Id. at PageID.2016–2017.

### J.      DNA Report

Just months after the plea and sentence, on June 15, 2007, the Reliagene lab issued a report with the DNA test results on the condom found at the scene of BH's attack. 2007 DNA Report at PageID.3678. The lab compared the DNA found on the condom to a buccal sample taken from

13

Calhoun and concluded that the samples were "not consistent." Id. The report concludes that "Terrance [sic] Calhoun is excluded as the DNA donor." Id.

The test failed to show the presence of seminal fluid on the condom. Id. at PageID.3679. This, Calhoun argues, is consistent with BH's report of the events of her attack, specifically, that the perpetrator did not ejaculate into the condom. Pl. Resp. at PageID.3240.

Additionally, the report stated that the test "produced a DNA profile consistent with a single male DNA donor and one 'weak peak' consistent with the known buccal swabs of [BH]."[8] Id.

Defendants deny that they knew about the DNA report. Defs. Mot. at PageID.1857. Ortiz testified that he did not believe that the condom was tested by the lab in 2007, at all. Ortiz Dep. Tr. at PageID.3450. He stated that the DPD protocol in the 2006–2007 time period was that evidence would not be DNA tested until a trial date was set, but that no such date was ever set in Calhoun's case and thus the condom was never tested. Id. He also testified that, sometime after around 2007, Wayne County and the State of Michigan created the Sexual Assault Kit Initiative task force to review old cases to address a backlog of unanalyzed DPD rape kits. Id. at PageID.3453. He testified that, once the task force was in place, all DNA test results in every sexual assault case would have been transmitted directly to the task force, bypassing Ortiz altogether. Id. at PageID.3453–3454. Thus, Ortiz argues, if the condom was indeed tested in 2007, Ortiz would not have been privy to the result. Id. Kane and Muhammad both deny that they were

---

[8] The parties do not explain the meaning of a "weak peak" in a DNA result. The parties dispute whether it can be inferred from the "weak peak" that BH's DNA was on the condom or not. DPD Lab Technician Christopher Steary explained that "If I presented one weak peak to a jury and said that her epithelial cells were inches away from this sample, it would be understandable and everyone would agree that the one weak peak probably came from BH, but there is no guarantee on one weak peak." Steary Dep. Tr. at PageID.3820 (Dkt. 118-23).

involved in the DNA collection or testing.  See Kane Dep. Tr. at PageID.3620–3621; see also Muhammad Dep. Tr. at 4144–4146.

The DPD lab technician Christopher Steary testified that the regular practice of the DPD lab was to send DNA test result reports to the officer in charge of the case, who, in BH's case, was Ortiz.  Steary Dep. Tr. at PageID.3795–3796.  He testified that it was not the DPD practice to send reports or other communications directly to the Wayne County Prosecutor's Office (WCPO) unless there was a trial date set.  Id. at PageID.3795.  He also testified that he did not recall Calhoun's labs, but that there was nothing about this case suggesting the DNA report was handled differently from the normal procedure.  Id.  at PageID.3809–3810.

Calhoun alleges that Defendants intentionally hid the report.  Pl. Resp. at PageID.3241.  Calhoun bases this assertion on Kane's testimony that he and Ortiz worked so closely together on the MV and BH cases that, had Ortiz known about the DNA report, Ortiz "more than likely" would have told Kane about it.  Kane Dep. Tr. at PageID.3642–3643.  Kane also testified that, even if Ortiz did not tell Kane, Ortiz "would have told somebody" about it and had an obligation to do so.  Id.

The assistant prosecutor assigned to the case, Louisa Papalas, testified at her deposition that she never received a copy of the DNA report.  Papalas Dep. Tr. at PageID.3495–3496 (Dkt. 118-13).  She observed in her deposition that the report was not addressed to either Kane or Ortiz, nor was it stamped that it was received by anyone at DPD or the WCPO.  Id. at PageID.3495.  She testified that, had she received the DNA test result—even after Calhoun's plea had been entered— she would have given it to Calhoun's counsel.  Id. at PageID.3496.  She stated that she also would have consulted the WCPO's appellate division to determine whether the result affected the integrity of Calhoun's convictions.  Id.  She confirmed that she was aware that the Michigan Rules

15

of Professional Responsibility require a prosecutor to turn over exculpatory evidence, even after a conviction.  Id.  She explained that, in her opinion, turning exculpatory information over to the defense even after a conviction would be "just the right thing to do."  Id. at PageID.3498.

### K.      Reinvestigation and Vacation of Convictions

The 2007 DNA results were discovered in 2019 when an official in the joint Wayne County and State of Michigan task force reviewed old cases and DPD's backlog of unanalyzed rape kits.  PSOAMF at ¶ 88.  The WCPO Conviction Integrity Unit (CIU) notified the State Appellate Defender Office (SADO) about the exclusionary results in Calhoun's case.  Id. at ¶ 89.

A CIU reinvestigation of Calhoun's convictions ensued.  See WCPO Media Stmt. at PageID.4475 (Dkt. 118-69).

On April 21, 2022, the WCPO and Calhoun's counsel entered a stipulation to vacate Calhoun's convictions and dismiss the cases against him with prejudice.  4/21/22 Order of Stip. Facts at PageID.2001–2003.  Their stipulation stated, in relevant part:

- Calhoun was arrested based on the police's claim that he matched the description of the perpetrator of the assaults against MV and BH.  Id. at PageID.2002.

- A 2006 and 2007 forensic examination indicated that Calhoun had cognitive deficiencies.  Id.

- Calhoun pleaded no contest to both crimes and was sentenced to prison.  Id.

- The June 15, 2007, DNA report excluded Calhoun as a donor on the condom found at the scene of BH's assault.  Id.

- There was no indication that the DNA report was provided to Calhoun or his counsel.  Id.

- After locating the DNA report in 2019, Calhoun's SADO counsel arranged for retesting of the condom, which confirmed the 2007 result that excluded Calhoun as a donor.  Id. at PageID.2003.

- The Michigan State Police reported a DNA match on the condom used in the BH

16

attack using the Combined DNA Index System CODIS[9] database, to an individual—not Calhoun—who was then facing charges for other sexual assault offenses in the Detroit area that had occurred between 2007 and 2014. Id. at PageID.2003.

- MV described her assailant as having "braids" and a "puzzle tattoo," and Calhoun had neither. Id. at PageID.2003.

- A national database search for an individual with a puzzle tattoo turned up an individual who was incarcerated in the Michigan Department of Corrections for sexual assault. Id.

- The stipulation concludes that Victim 1, MV, described an assailant who "definitively cannot be Mr. Calhoun." Id.

On April 27, 2022, Wayne County Circuit Court Judge Kelly A. Ramsey held a hearing to address the "Motion to Request related to the parties' stipulated order." 4/27/22 Hr'g Tr. at PageID.3898 (Dkt. 106-18). The judge had the assistant prosecutor, Valerie Newman, read aloud from the parties' stipulated findings of fact and agreed order to vacate the convictions. Id. at PageID.3899.

After doing so, Newman explained that, at a hearing held the previous week in this case, a police officer tried to give the judge a manila envelope containing a copy of the June 2007 DNA report.[10] Id. at PageID.3905. Judge Ramsey explained that, after this incident, she had pushed the hearing to April 27 "to ensure that there was an opportunity for due diligence," and to give all parties "an opportunity for a second look." Id. at PageID.3909.

---

[9] CODIS is "a tool that enables federal, state, and local forensic laboratories to exchange and compare DNA profiles electronically, thereby linking serial violent crimes to each other and to known offenders." See https://le.fbi.gov/science-and-lab/biometrics-and-fingerprints/codis (last visited 2/25/26).

[10] Calhoun's counsel identified the officer as Kane. 4/27/22 Hr'g Tr. at PageID.3910. He argued that, in his opinion, "Officer Cain [sic] was just making one final plea. . . to preserve this conviction." Id.

The court stated that it had read the stipulated facts, that the matter came to the court "based upon the parties stipulation," and, being otherwise fully advised, the Court "is going to grant the motion and, hereby, order that the convictions and the sentences in the above captioned matters be vacated." Id. at PageID.3912; see also 4/27/22 Vacatur Order at PageID.2007 (Dkt. 106-29).

### L.    Present Litigation

In his complaint in this case, Calhoun argues that Defendants "coerced and fabricated a false confession, planted evidence, and used unlawful suggestion to obtain false identifications from the two young teenage victims." Compl. ¶ 4 (Dkt. 1). He argues that, for years, Defendants "hid and withheld exculpatory forensic evidence that exonerated Calhoun to cover up both Calhoun's innocence and their egregious misconduct in this case." Id.

His claims against Defendants are: (i) liberty deprivation without due process of law and denial of a fair trial in violation of the Fourteenth Amendment, id. at ¶¶ 108–118; (ii) malicious prosecution in violation of the Fourth and Fourteenth Amendments, id. at ¶¶ 119–123; (iii) failure to intervene, id. at ¶¶ 124–127; (iv) supervisor liability, id. at ¶¶ 128–131; and (v) conspiracy to deprive Calhoun of his constitutional rights, id. at ¶¶ 132–137. He seeks compensatory and punitive damages against Defendants. Id. at PageID.33.

Because both sides raise the Heck issue in their respective motions, see Pl. Mot. at PageID.1630 and Defs. Mot. at PageID.1822, the Court considers that issue first, followed by the rest of the issues raised in Defendants' motion.

18

## II.     ANALYSIS[11]

### A. <u>Heck v. Humphrey</u> Doctrine

The <u>Heck</u> doctrine precludes a plaintiff from recovering under § 1983 for an allegedly unconstitutional conviction or imprisonment, or for other action that would render a conviction or sentence invalid, unless "the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus." <u>Heck</u>, 512 U.S. at 487. Calhoun argues that <u>Heck</u> is not a bar to his claims because, after the 4/27/22 vacatur order was entered, there was no longer an ongoing criminal prosecution involving him, nor were there outstanding criminal convictions entered against him. Pl. Mot. at PageID.1638–1640. Calhoun's position is correct and supported by <u>Thompson v. Clark</u>, 596 U.S. 36 (2022) and <u>Carr v. Louisville-Jefferson Cnty.</u>, 37 F.4th 389 (6th Cir. 2002).

<u>Thompson</u> involved a plaintiff who was arrested and charged with obstructing justice and resisting arrest. Before the trial, the prosecutor moved to dismiss the charges, which the court granted. Neither the prosecutor's motion nor the court's order dismissing the plaintiff's case

---

[11] In assessing whether a party is entitled to summary judgment, the Court applies the traditional summary judgment standard as articulated in <u>Scott v. Harris</u>, 550 U.S. 372, 380 (2007). A court will grant a motion for summary judgment where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). If the movant makes an initial showing that there is an absence of evidence to support the nonmoving party's case, the nonmovant can survive summary judgment only by coming forward with evidence showing there is a genuine issue for trial. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 324–325 (1985).

Defendants also move for judgment on the pleadings. Pursuant to Federal Rule of Civil Procedure 12(c), "[a]fter the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c). To survive a Rule 12(c) motion, the "complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." <u>Engler v. Arnold</u>, 862 F.3d 571, 575 (6th Cir. 2017) (quoting <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009)). The defendant has the burden of showing that the plaintiff has failed to state a claim for relief. <u>Directv, Inc. v. Treesh</u>, 487 F.3d 471, 476 (6th Cir. 2007).

provided an explanation as to why the charges were dropped or why the case was dismissed. In the subsequent § 1983 claim for malicious prosecution, the defendant officers argued that Heck barred the plaintiff's claims because without an explanation of why the charges were dismissed, the termination was not "favorable" to the plaintiff. Thompson, 596 U.S. at 40. In response, the plaintiff argued that he needed only to show that the prosecution "ended without a conviction" to satisfy Heck's requirement. Id. at 39.

The Supreme Court agreed with the plaintiff. "To demonstrate a favorable termination of a criminal prosecution for purposes of [a] Fourth Amendment claim under § 1983 for malicious prosecution, a plaintiff need only show that his prosecution ended without a conviction." Id. It explained that this showing does not require the plaintiff to demonstrate "that the criminal prosecution ended with some affirmative indication of innocence." Id. at 49. This was in harmony with the reason for the "favorable termination" requirement under Heck:

> (i) it avoids parallel litigation in civil and criminal proceedings over the issues of probable cause and guilt; (ii) it precludes inconsistent civil and criminal judgments where a claimant could succeed in the tort action after having been convicted in the criminal case; and (iii) it prevents civil suits from being improperly used as collateral attacks on criminal proceedings.

Id. at 44.

The principles announced in Thompson were followed by the Sixth Circuit in Carr, which involved a § 1983 action for wrongful conviction brought after the plaintiff was pardoned by the governor of Kentucky without any finding of innocence. 37 F.4th at 390. The defendant officers sought dismissal under Heck, arguing that the conviction had not been invalidated because the pardon did not contain any language indicating that the plaintiff was innocent.

The Sixth Circuit disagreed with the officers, stating that a pardon—"even one that does not indicate an individual is innocent"—fulfills Heck's purposes of eliminating "all legal

20

consequences of the individual's conviction, avoiding the concern of parallel litigation with an outstanding criminal proceeding." Id.

The same is true here, where the state court's vacatur order dismissed and vacated Calhoun's criminal convictions and sentences and dismissed the charges with prejudice. It makes no difference to the result that the order does not contain a finding of Calhoun's "innocence." For purposes of Heck, the vacation removes concerns of parallel litigation, precludes inconsistent judgments, and prevents collateral attacks on criminal proceedings.

Defendants' arguments to the contrary lack merit. In their response to Calhoun's motion and in their own motion, they raise two inter-related issues.[12] First, they argue that the vacation of the conviction was not valid because the Michigan court rules require that a "motion" be filed and, here, there was no "motion" presented to the trial court. Defs. Mot. at PageID.1841–1843. Second, they argue that because the vacation was not in accordance with the Michigan court rules, the court's action in entering the vacatur order was ultra vires. Id. Neither argument succeeds.

The Court rejects Defendants' first argument because it is contrary to Michigan law. In People v. Jackson, 790 N.W.2d 340, 350 (Mich. 2010), the Michigan Supreme Court explained that there is a "broad definition of a motion" under Michigan law, which does not require a filing to be expressly denominated as a "motion." In Jackson, a criminal defendant persuaded the Michigan Court of Appeals that one of his convictions had been improper, but that court refused to remand for resentencing because his sentence was within the appropriate guideline range and he had failed to follow the procedural predicates for resentencing. Id. at 343–344. The procedural predicates are spelled out in Mich. Comp. Laws § 769.34(10), which prohibits an appeal regarding

---

[12] Defendants acknowledge this overlap in their motion and incorporate their "comprehensive" response to Calhoun's motion. Defs. Mot. at PageID.1843. Defendants do not present any additional arguments in their motion that are not addressed in their response to Calhoun's motion.

a sentencing guidelines challenge unless the party raised the issue at sentencing or "in a proper motion for resentencing, or in a proper motion to remand filed in the court of appeals." Jackson, 790 N.W.2d at 346.  The prosecution argued that the defendant's request for resentencing was improper because it was made in the defendant's brief on appeal—which it contended did not qualify as a "motion." Id.

The Michigan Supreme Court rejected the prosecution's "narrow interpretation" of the law. Id.  It instructed that the prosecution's interpretation "disregards the plain language of the statute and our court rules." Id.  It found that purpose of the rule regarding resentencing was to allow the court to "rule on an issue on a timely basis when the issue is ripe for adjudication." Id. at 349. The defendant's inclusion of his request for remand as part of his brief served that purpose. Id.

It also explained that, in Michigan "'[m]otion' is defined as a 'written or oral application requesting a court to make a specified ruling or order.'  'Application' is defined as a 'request or petition.'" Id. at 350 (citing Black's Law Dictionary (8th ed.)).  The defendant's request for resentencing in his brief satisfied these requirements:

> The Michigan Court Rules allow for this broad construction.  MCR 1.105 permits construction of the court rules "to secure the just, speedy, and economical determination of every action and to avoid the consequences of error that does not affect the substantial rights of the parties." . . .  Further, our construction of the [resentencing] statute avoids the consequences of error that would result from imposing a dubious technical requirement that serves no purpose other than elevating form over substance.

Id. at 800.

The same principles apply here.  Calhoun and the prosecutor's office jointly presented their request to the state court to vacate his convictions.  This request satisfied the requirements of a "motion" under Michigan law.  Additionally, the stipulated and agreed-upon order served the Michigan court rules' purpose of permitting a just, speedy, and economical method of requesting relief. Rule 1.105. And Rule 6.508, which governs the general procedures under the entire

subchapter for post-appeal relief, gives the circuit court latitude to "proceed in any lawful manner," as the court "deems appropriate." See Rule 6.508(A). Nothing in the rules suggests that entering an order via stipulation is unlawful or inappropriate. Nor have Defendants cited any cases for this proposition. Accordingly, the Court rejects Defendants' argument that the stipulation was not a "motion."

The Court also rejects Defendants' second argument that the state court action was ultra vires. The same argument has been rejected in two other cases in this district: (i) Smith v. Cnty. of Wayne, No. 21-12070, 2023 WL 8788944, at *2 (E.D. Mich. Dec. 19, 2023), aff'd sub nom. Smith v. Wayne Cnty., 147 F.4th 613 (6th Cir. 2025), and (ii) Cotton v. Hughes, No. 22-cv-10037, 2025 WL 410077, at *7 (E.D. Mich. Feb. 5, 2025).

In Smith, the plaintiff's conviction was vacated by a stipulation between the prosecutor and the plaintiff. Smith, 2023 WL 8788944 at *2. The plaintiff later sued one of the police detectives (among others) who was involved in investigating the case that led to his conviction. Id. at *1. The defendant officer argued that "the Court lacks jurisdiction over the case because the order vacating the plaintiff's conviction and sentence was an ultra vires act by the state court, since it was entered based on a stipulation by the parties and not in response to a motion filed by either the defendant or the prosecution." Id. at *11 (punctuation modified). The district court rejected this argument, stating that an ultra vires act means that the official "acts without any authority whatever," and that a court vacating its own judgment does not fall within that definition. Id. at *12. The same result was reached in Cotton, 2025 WL 410077 at *7 (rejecting the defendants' argument that vacation of a conviction based on a stipulation was not a proper motion and thus ultra vires, and noting that the defendants cited no federal cases adopting that argument).

The same reasoning and result apply here.  Defendants have not demonstrated that when the state court's entered the vacatur order, it did so "without any authority whatever."  See Skatemore, Inc. v. Whitmer, 40 F.4th 727, 736 (6th Cir. 2022).  As the Smith court found, Calhoun's stipulation was consistent with the Michigan court rules' recognition of his right to present a motion for relief from judgment.  Mich. Ct. R. 6.501 cmt.  And, like the defendants in both Smith and Cotton, Defendants in this case have cited no cases where a federal district court has held that a state court's vacation of a criminal conviction was ultra vires based on an alleged procedural defect.  For all of these reasons, the Court rejects Defendants' ultra vires argument.  Defendants' Heck  arguments are rejected.[13]

The Court, therefore, grants Calhoun's motion for partial summary judgment and denies Defendants' motion on this issue.

## B.   Defendants' Motion

Next, the Court will analyze the remaining arguments presented in Defendants' motion.

### 1.  Collateral Estoppel

Defendants argue in their motion that the doctrine of collateral estoppel bars Calhoun from relitigating three issues that were already determined by the state court when Calhoun pleaded nolo contendre.  Defs. Mot. at PageID.1843–1844.  In their response to Calhoun's motion for partial summary judgment, Defendants state that the three already-litigated issues are: "(1) Plaintiff's confession was voluntarily given; (2) the in-court identifications of Plaintiff as the assailant by

---

[13] Defendants' citation of People v. Meservey, 42 N.W. 1133 (Mich. 1889) is not persuasive.  That case held that after sentencing the trial court had no power to vacate the sentences imposed.  But that case well preceded the Michigan Court Rules of 1985 by almost a century, which authorized sentencing courts to vacate their judgments.

24

M.V. and B.H. were constitutionally valid; and (3) no violation of <u>Brady</u> had occurred."  Defs. Resp. at PageID.2566.

Collateral estoppel applies when: "(1) an issue has been actually litigated and determined by a valid and final judgment; (2) the same parties have had a full and fair opportunity to litigate the issue; and (3) there is mutuality of estoppel."  <u>Peterson v. Heymes</u>, 931 F.3d 546, 554 (6th Cir. 2019).  Defendants' argument fails at the first collateral estoppel element because they ignore the fact that Calhoun's convictions were vacated.

In <u>Peterson</u>, the Sixth Circuit explained that, when a criminal judgment has been vacated, the trial court's earlier interlocutory rulings "have merged with the final judgment, which means those interlocutory rulings have been vacated too.… And vacated rulings have no preclusive effect under Michigan law."  <u>Id.</u> at 554.  This forecloses Defendants' argument on all three "already-litigated" issues.  Defendants do not cite any authority that the Court should decide this case differently from the clear ruling in <u>Peterson</u>.

Because Calhoun's convictions were vacated, there is no valid final judgment that precludes the Court from considering Calhoun's claims.  The Court rejects Defendants' collateral estoppel argument and denies them summary judgment on this basis.

### 2. **Nolo Contendre Plea**

For similar reasons, the Court rejects Defendants' argument that Calhoun's decision to plead nolo contendre waived his right to challenge the constitutionality of his criminal convictions. <u>See</u> Defs. Mot. at PageID.1844–1845.  They rely on <u>Tollett v. Henderson</u>, 411 U.S. 258, 259 (1973) and <u>United States v. Gregg</u>, 463 F.3d 160, 164 (2d Cir. 2006), for the proposition that, after entering a guilty plea, a defendant cannot raise claims for the first time in post-conviction proceedings when his own actions deprived him of his constitutional rights.  They also rely on <u>People v. New</u>, 398 N.W.2d 358, 360 (Mich. 1986) for the proposition that, in Michigan, a nolo

25

contendre plea has the same effect as a guilty plea and waives all non-jurisdictional defects in the proceedings resulting in a conviction.  Id.

Tollett, Gregg, and New do not apply to this case because none involved an order vacating the underlying conviction.  As the Court explained above, under Peterson, after a conviction is vacated, the trial court's earlier rulings, including the trial court's acceptance of a nolo contendre plea, lost their preclusive effect.  Peterson, 931 F.3d at 555.  Because Calhoun's convictions were vacated, his nolo contendre pleas did not waive his claims regarding defects in the proceedings.

Defendants offer a second argument relating to Calhoun's nolo contendre plea that fares no better.  Defendants argue that Calhoun's nolo contendre plea is the "single most proximate cause of Plaintiff's damages" and bars him for recovering for Defendants' alleged misconduct.  Defs. Mot. at PageID.1846–1847.  But the cases Defendants cite—United States v. Ruiz, 536 U.S. 622, 628–629 (2002) and Gregg, 463 F.3d at 164—did not involve a criminal defendant whose convictions were later vacated, like Calhoun.

Moreover, causation is generally a jury question.  See Payne v. Novartis Pharms. Corp., 767 F.3d 526, 528 (6th Cir. 2014).  Calhoun has presented issues of material fact for the jury to decide regarding causation.  He argues that Defendants suppressed a DNA report excluding him, coerced his confession, and improperly suggested to the victims whom to identify in the photo lineup.  This, Calhoun argues, led to his plea and subsequent 15-year prison sentence for crimes he alleges he did not commit.  A jury will evaluate issues of causation where, as here, the party with the burden of proof has set forth sufficient evidence of his claim.

Calhoun's citation to Sanford v. City of Detroit, No. 17-13062, 2018 WL 6331342, at *9 (E.D. Mich. Dec. 4, 2018) is persuasive.  There, the plaintiff pleaded guilty to criminal charges, which were later set aside via stipulation.  Id. at *4.  The plaintiff sued the police officers who

were involved in his investigation arguing, among other things that the defendants fabricated evidence against him, which led to his guilty plea for a crime he did not commit. Id. at *8. The police officers alleged, similar to Defendants here, that the plaintiff's guilty plea was the superseding cause of his damages, which barred the plaintiff from recovering for the defendants' alleged misconduct. The district court rejected the defendants' argument, stating: "The defendants' position that they should be absolved of liability for stacking the deck against the plaintiff because their efforts to corner him into a guilty plea succeeded is nonsense, and they cite no authority to support it." Id. at *9 (emphasis in original).

Similarly, Calhoun alleges that he pleaded guilty in the earlier proceeding based on fabricated evidence, including an allegedly coerced confession and unfairly suggestive photo lineup. He argues that Defendants succeeded in obtaining his convictions, which were later overturned. Defendants cite no law explaining why they should be permitted to use Calhoun's decision to enter a nolo contendre plea (in the face of allegedly fabricated and coerced evidence) as a shield to liability. Like the defendants' argument in Sanford, Defendants' argument here fails.

In sum, the Court rejects Defendants' argument that Calhoun's nolo contendre plea waived Calhoun's ability to raise post-vacatur challenges to the constitutionality of his criminal convictions and it also rejects Defendants' argument that the nolo contendre plea is the proximate cause of Calhoun's damages. The Court denies Defendants' motion on their plea-based arguments.

### 3. **Qualified Immunity**

Defendants argue that they are entitled to qualified immunity on Calhoun's (i) evidence suppression claim, (ii) coerced confession claim, and (iii) improperly suggestive photo identification claim. Defs. Mot. at PageID.1850–1869. The Court denies Ortiz and Kane qualified immunity as to the evidence suppression claim. It grants qualified immunity to Ortiz and denies

27

qualified immunity to Kane as to the coerced confession claim.  The Court grants both Ortiz and Kane qualified immunity as to the suggestive photo identification claim.

"Qualified immunity shields government officials in the performance of discretionary functions from standing trial for civil liability unless their actions violate clearly established rights of which a reasonable person would have known."  Bunkley v. City of Detroit, 902 F.3d 552, 559 (6th Cir. 2018).  At the summary judgment stage, to overcome a claim of qualified immunity, the plaintiff must show that "(1) the defendant violated a constitutional right; and (2) the right was clearly established."  Quigley v. Tuong Vinh Thai, 707 F.3d 675, 680 (6th Cir. 2013).

"[I]f the facts alleged and evidence produced, viewed in the light most favorable to the plaintiff, would permit a reasonable juror to find that the officer violated a clearly established constitutional right, dismissal by summary judgment is inappropriate."  Barton v. Martin, 949 F.3d 938, 947 (6th Cir. 2020).  Plaintiffs have the burden of demonstrating Defendants are not entitled to qualified immunity.  Bell v. City of Southfield, 37 F.4th 362, 367 (6th Cir. 2022).

### a.  Suppression of DNA Evidence Claim

Calhoun's suppression of evidence claim argues that Defendants knew about the DNA report when it was issued in June 2007 and failed to disclose it.  Defendants challenge both prongs of the qualified immunity analysis for this claim, arguing that Calhoun's rights were not clearly established and that his rights were not violated.

### i.  Clearly Established Constitutional Right

Under the clearly established prong, a plaintiff must demonstrate that the constitutional right at issue was clearly established at the time of the alleged misconduct.  Pearson v. Callahan, 555 U.S. 223, 243–244 (2009).  "A clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he is doing violates that right."  Mullenix v. Luna, 577 U.S. 7, 11 (2015) (punctuation modified).  The purpose of the "clearly

established" requirement is to give "fair and clear warning to officers" of their constitutional obligations. Kisela v. Hughes, 584 U.S. 100, 105 (2018).

Clearly established law is not defined at "a high level of generality." Ashcroft v. al–Kidd, 563 U.S. 731, 742 (2011). "The dispositive question is whether the violative nature of particular conduct is clearly established . . . This inquiry must be undertaken in light of the specific context of the case, not as a broad general proposition." Mullenix, 577 U.S. at 12 (emphasis in original) (punctuation modified). "Though a plaintiff need not point to a case on all fours with the instant fact pattern to form the basis of a clearly established right, there must be a sufficiently analogous case (or cases) from which a reasonable official would understand that what he is doing violates that right." Hester v. Chester Cnty., 162 F.4th 780, 785 (6th Cir. 2025).

Defendants argue that Calhoun has not identified a clearly established constitutional right because the disclosure obligations set forth in Brady v. Maryland, 373 U.S. 83 (1963) do not apply to this case. Defs. Mot. at PageID.1850–1854. Under Brady, "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Id. at 87. Brady, Defendants explain, is a trial right and does not apply to evidence that did not exist until after a conviction. Mot. at PageID.1853–1854.

There is no dispute that the DNA report was not issued until after Calhoun's convictions.[14] Calhoun pleaded nolo contendre on February 21, 2007. See Plea Hr'g Tr. at PageID.4274; State of Mich. v. Calhoun, Reg. of Actions at PageID.1942–1943 (Dkt. 106-17). The DNA report is dated June 15, 2007. 2007 DNA Report at PageID.1993–1995.

---

[14] Because the facts clearly indicate that the evidence did not exist until after Calhoun's conviction, Defendants' explanation that there is no right to receive exculpatory evidence before a plea is irrelevant. See Defs. Mot. at PageID.1853–1854.

Defendants are correct that Brady does not apply to Calhoun's claim.  In Dist. Attorney's Off. for Third Jud. Dist. v. Osborne, 557 U.S. 52, 68 (2009) the Supreme Court clarified that the government's disclosure obligation under Brady does not continue "after the defendant [is] convicted and the case [is] closed."  Osborne, 557 U.S. at 69.  In Osborne, the plaintiff was convicted after a jury trial of kidnapping, assault, and sexual assault.  Id. at 58.  Before his conviction, the state had performed an imprecise type of DNA testing on a condom found at the scene that linked him to the crime.  Id. at 57–58.  In his later § 1983 proceeding, the plaintiff argued that he had a constitutional entitlement under Brady to access the DNA sample from the state so that he could, at his own expense, conduct more discriminating DNA testing and demonstrate his innocence even after his trial.  Id. at 59–60, 67–68.

The Supreme Court disagreed.  It explained that Brady is not a post-conviction right; its purpose is to protect a defendant's liberty interest in a fair trial while the defendant is still presumed innocent.  Id. at 69.  But after a defendant has been convicted and afforded a fair trial, the presumption of innocence disappears, and the defendant "does not have the same liberty interests as a free man" that Brady protects.  Id. at 68.  Defendants are, therefore, correct that Brady is not the proper framework for Calhoun's suppression of evidence claim.

But Calhoun does not argue that Brady is applicable to his claim that Defendants violated his due process rights in suppressing the DNA results.  He argues that there is a post-conviction due process right requiring disclosure of exculpatory evidence by those who were involved in the prosecution, including police officers.  See Resp. at Page.ID 3241.  Several cases recognize this principle: (i) Sanford, 2018 WL 6331342, *9; (ii) Howard v. City of Durham, No. 17-477, 2018 WL 1621823, at *4 (M.D. N.C. Mar. 31, 2018); (iii) Saldana v. Donovan, No. 2:24-CV-00895, 2024 WL 5465046, at *1 (C.D. Cal. July 2, 2024); (iv) Burgess v. Baltimore Police Dep't, No.15-

30

0834, 2016 WL 795975, at *1 (D. Md. Mar. 1, 2016).  And this principle has been found to be a right established by at least 2009, because "Osborne established, in 2009, that convicted individuals have a liberty interest in demonstrating their innocence with new evidence under state law." Howard, 2018 WL 1621823 at *5.

In Sanford, the court found it "well established" under the law that police suppression of exculpatory evidence—even where that evidence arises after a conviction—can violate due process rights.  Sanford, 2018 WL 6331342, at *9.  The plaintiff was 14 years old when he was charged with committing four murders.  Id. at *1.  At the plaintiff's preliminary hearing, police officers testified that he wrote out a confession and drew a sketch of the crime scene.  Id. at *3.  The plaintiff pleaded guilty to the murders.  Id. at *2.  Two weeks after the plaintiff began serving his prison sentence, the actual perpetrator was arrested and taken to a police station for questioning, where he confessed to several murders, including the ones for which the plaintiff had been convicted.  Id. at *3.  He told police that the plaintiff was not involved in those murders and provided details about the murders that were not known by the police.  During a break in the questioning, one of the police officers allegedly took the perpetrator to the bathroom and instructed him to stop making statements about the murders for which the plaintiff had been convicted.  Id.

Years later, the fact of the actual perpetrator's confession became public.  This led to one of the investigating officers admitting that he, and not the plaintiff, drafted the written confession and drew the sketch of the crime scene.  Id. at *4.  The officer further admitted that he had lied about those facts at the plaintiff's preliminary hearing.  Id.  Based on the confession of the actual perpetrator and the officer's admission of his lies, the plaintiff and the government entered a joint stipulation to vacate his conviction.  Id.  The plaintiff then sued the officers under § 1983 alleging,

31

among other things, that his due process rights were violated after his conviction by the police's suppression of the actual perpetrator's confession.

The trial court rejected the officers' motion to dismiss and found, in relevant part, that the plaintiff stated a constitutional claim under the facts and circumstances of the case.  Id. at *9.  It found that the plaintiff had plausibly pled a substantive due process claim when he alleged that his guilty plea was procured by the officers who "made up evidence and concocted a written confession out of whole cloth…."  Id.  It also found that the plaintiff had plausibly alleged "violations of his post-conviction due process rights caused by the defendants' continued efforts to obscure and conceal the evidence that another person had confessed to the murders."  Id. at *10.  It explained: "It is well established that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."  Id. at *9 (citing Wearry v. Cain, 577 U.S. 385, 392 (2016) (quoting Brady, 373 U.S. at 87)).  Based on this "well established principle," the court permitted the plaintiff to pursue his constitutional due process claim against the defendant officers for withholding evidence that prolonged the plaintiff's imprisonment.

Howard recognized a similar clearly established constitutional principle.  In Howard, the plaintiff served 23 years in prison after a jury convicted him of a double murder.  Howard, 2018 WL 1621823 at *1.  Before his trial, the plaintiff's counsel requested that the sexual assault kits collected from the two murder victims be DNA tested.  The testing "conclusively excluded" the plaintiff as the source of the sperm on both victims.  Id.  Regardless, he was convicted.  Id.

Years later, the plaintiff filed a motion to have the sexual assault kit re-tested under the then-new North Carolina law creating a statutory right to post-conviction DNA testing.  Id.  The plaintiff obtained a court order requiring the police to immediately share with the plaintiff's

32

counsel any information it possessed about the kit. Id. at *2. The police conducted the DNA re-tests, which not only confirmed that the plaintiff was excluded as the source DNA, but also found a match to another individual, Jones. The defendants conducted an interview of Jones, during which he made several inconsistent statements and implicated himself in the murders.

The plaintiff alleged that the police intentionally failed to report the DNA results and Jones's contradictory statements, despite the court's order requiring them to do so. Id. The defendants argued that qualified immunity protected them from the lawsuit because the plaintiff had failed to identify a clearly established constitutional right to the post-conviction DNA evidence or to the fact that they interviewed Jones and that he implicated himself in the crimes. Id. at *3. The court disagreed with the defendants. It stated that, under the principles expressed in Osborne, "conduct that transgresses any recognized principle of fundamental fairness in operation can cause a violation of a convicted individual's right to demonstrate his innocence with new evidence." Id. at *4 (citing Osborne, 557 U.S. at 68–69). It also noted that "[s]everal courts have found that these state post-conviction relief statutes that create a liberty interest carry with them a corresponding right to receive reasonably accurate and truthful information from state actors who respond to requests for evidence." Id. It found, in sum, that "bad faith suppression of evidence [by police officers] was a violation of a clearly established right as of 1988," regardless of the fact that the evidence was post-conviction evidence.

Like the claims in Sanford and Howard, the claims here assert that Defendants transgressed clearly established due process rights by withholding key evidence that arose after his convictions, which delayed Calhoun's exoneration for 15 years. It is difficult to imagine that any reasonable officer would have understood it was acceptable to withhold a DNA report showing that Calhoun was excluded as a donor—even though the report was issued after his conviction. Any reasonable

33

officer would have understood that doing so violated Calhoun's clearly established constitutional rights.  The allegedly suppressed evidence was material to Calhoun's guilt or innocence, as it was relied upon in the reinvestigation of Calhoun's convictions and was the basis of the vacatur order. See 4/27/22 Vacatur Order; 4/21/22 Order of Stip. Facts at PageID.2001–2003.

The clearly established standard is met—and not only because every reasonable officer would understand the conduct at issue violated the defendant's constitutional rights, see Kisela, 584 U.S. at 105.  It is met because both Kane and Ortiz testified that they actually understood that intentionally suppressing the DNA report would violate Calhoun's rights.

Ortiz testified that in general, even if an offender had already pleaded guilty, Ortiz agreed that he was obligated to communicate that result  of a related forensic lab result to the prosecutor. Ortiz Dep. Tr. at PageID.3359.  Ortiz went further and admitted that if he knew of a DNA report that excluded Calhoun and failed to inform the prosecutor—and Calhoun's attorneys—that failure would violate Calhoun's due process rights.  Id. at PageID.3361.  Kane similarly testified that he understood his due process obligation to inform the prosecutor of an exclusionary DNA report, even if it arose after a plea.  Kane Dep. Tr. at PageID.3640–3641.

For these reasons, the Court finds that the constitutional right at issue in Calhoun's suppression claim was clearly established at the time it occurred.[15]

---

[15] Defendants argue that no Supreme Court case has held that police officers have a duty to disclose exculpatory evidence.  Defs. Mot. at PageID.1851.  But several other courts have, including the Sixth Circuit.  See Moldowan v. City of Warren, 578 F.3d 379–380 (6th Cir. 2009)("[B]ecause the police are just as much an arm of the state as the prosecutor, the police inflict the same constitutional injury when they hide, conceal, destroy, withhold, or even fail to disclose material exculpatory information….[T]he police's obligation to turn over material and exculpatory evidence…follows inexorably from the Supreme Court's recognition that the police have a constitutional duty to preserve such evidence.").  Calhoun claims the turnover of information known by Defendants never occurred because they withheld the information from the prosecutor, Louisa Papalas, who testified that she would have disclosed the DNA report to Calhoun's counsel had Defendants brought it to her attention, but they never did.  Papalas Dep. Tr. 3490, 3495.

### ii. Evidence of Violation

Defendants also challenge the second qualified immunity prong on Calhoun's suppression of evidence claim—they argue that Calhoun's rights were not violated. The Court disagrees and finds that there is a genuine dispute of material fact as to their violation of Calhoun's rights.

The Supreme Court explained, in Stickler v. Greene, 527 U.S. 263, 280–281 (1999), the components of a suppression of evidence claim: "The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." Id. at 281–282. [16]

### (a) Elements 1 and 3—Favorable and Material

In the first part of their argument, Defendants challenge the first and third elements together—that the evidence was favorable to the accused and that the evidence was material such that prejudice ensued. Defs. Mot. at PageID.1854–1856. "[E]vidence is 'material' . . . when there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different." Turner v. United States, 582 U.S. 313, 324 (2017).

Defendants argue that the DNA report was not favorable or material to Calhoun because there is insufficient evidence tying the condom to the attack on BH. Defs. Mot. at PageID.1854–1855. If the condom is not the condom used in BH's assault, they argue, it does not matter that Calhoun's DNA was not on it. Id.

---

[16] Defendants cite Stickler—which applies the Brady suppression of evidence claim standard—even though they argue earlier in their motion that Brady does not apply. Defs. Mot. at PageID.1854. Plaintiffs do not set forth a different non-Brady standard in their response. In the absence of any reasons provided by the parties not to apply the three Stickler elements to Calhoun's suppression claim, the Court will do so.

35

Defendants make several arguments why the condom is not tied to BH's assault.  First, they emphasize that the 2007 report found only a "weak peak consistent with the known buccal samples of BH," so there is insufficient DNA to tie BH to the condom.  Mot. at PageID.1855–1856.  Second, they rely on the testimony and reports of Cassandra DeRuitter, a Michigan State Police forensic scientist, who testified that BH's "DNA types were not consistent with the DNA profile that was developed from the outside condom swab, so I was able to exclude her as being a contributor to that DNA sample."  DeRuitter Dep. Tr. part 1 of 2 at PageID.3708 (Dkt. 106-34); see Defs. Mot. at PageID.1855–1856.

Third, they rely on their DNA expert Monte Miller.  Miller wrote in his report that "There is a very low level of minor DNA, the amount that could be from BH is extremely limited, and she is reported to have been in the same approximate time and space as the condom, therefore, even if her DNA is present it does not demonstrate that this was her attackers [sic] condom, though this remains a possibility."  Miller Rpt. at PageID.3691 (Dkt. 118-17).

Defendants argue also that the location where BH assault occurred was an area "frequently utilized as the site for sexual activity by prostitutes and their clients around 2006 and 2007."  Defs. Mot. at PageID.1855.  Thus, they argue, these facts indicate that there is "simply no evidence" that the condom recovered from the scene is connected to the BH assault.  Id.

Calhoun asserts that there is sufficient evidence from which a jury could find that the condom was connected to the assault on BH.  The condom: (i) was found during the DPD's processing of the crime scene; (ii) was found within hours of the attack on BH; (iii) was located exactly where BH said her attacker discarded his condom; (iv) was the only condom found in that location; and (v) matched BH's account in that it was used but not ejaculated into.  See Ortiz Dep Tr. PageID.5153–5155, 5162–5163; Evid. Tech. Rpt. at PageID.3478; Crime Scene Photos at

36

PageID.3480 (Dkt. 118-12).  Calhoun also offers the testimony of his own expert, Ruth Ballard, who concluded in her report that one DNA marker on the condom is consistent with that of BH, which contradicts Defendants' expert Miller's conclusion.  R. Ballard Expert Rpt. at PageID.3756 (Dkt. 118-21).

There is a genuine dispute of material fact as to whether the condom is tied to the BH assault.  Taking the facts in the light most favorable to Calhoun, a jury could reasonably find that the DNA report is both favorable to Calhoun and material.  Therefore, the Court rejects Defendants' argument that Calhoun fails to meet the favorable and material suppression elements.

#### (b)  Element 2—Suppression

Defendants also argue that Calhoun fails to meet the second suppression of evidence element—that they suppressed the DNA report.  This argument, too, fails.

Defendants argue there is no evidence of suppression because the DNA report is addressed to "Detroit Police Department" to the attention of "Chris Steary or Glen Hall;" and not to any of them.  See 2007 DNA Report at PageID.3678.  Steary, a former DPD lab technician, testified that he did not recall seeing the report or speaking with Hall or any of the Defendants.[17]  They also argue that Ortiz gave "unequivocal" testimony that he neither received, nor was aware of, the report.  Defs. Mot. at PageID.1857.  As the Court understands Ortiz's testimony, his position was that the DNA tests were not conducted at all because Calhoun did not have a trial date set and, alternatively, if the tests were conducted, the results would have been sent to a different department—the sexual assault kit task force—and not to Ortiz.  See Ortiz Dep. Tr. at

---

[17] Defendants do not explain who Glen Hall is.  In Steary's deposition transcript, he stated that Hall was his "direct leader."  Steary Dep. Tr. at PageID.3806.

PageID.3450.  Defendants also argue that there is no evidence the other Defendants knew about the DNA results, though they do not cite this argument with support from the factual record.

Calhoun has presented enough facts that a jury could determine that Defendants received, and failed to disclose, the DNA report.  He has presented Steary's testimony that the result would normally have been sent to the officer in charge, Ortiz, and that there was nothing out of the ordinary in the handling of the DNA report in this case.  Steary Dep. Tr. at PageID.3795–3796, 3809–3810.  Calhoun has also presented Kane's testimony that, if Ortiz knew about the report, it is "more than likely" he told Kane about it.  Kane Dep. Tr. at PageID.3642–3643.  Additionally, Calhoun has presented the assistant prosecutor Louisa Papalas's testimony that Defendants never told her about the report and, if they had, she would have disclosed it to Calhoun's counsel. Papalas Dep. Tr. at PageID.3495–3496.

Calhoun has set forth sufficient evidence that a reasonable jury could find that Defendants suppressed the DNA report.  Because Calhoun meets all three suppression of evidence elements, he has satisfied the second prong of the qualified immunity analysis as to his evidence suppression claim.  Defendants' motion that qualified immunity protects them from Calhoun's suppression claim is denied.

### b.  Coerced and Fabricated Confession Claim

Defendants argue that they are protected by qualified immunity on Calhoun's coerced and fabricated confession claim because Calhoun has not presented evidence that Defendants— particularly Kane, who conducted Calhoun's interrogation—coerced or fabricated his confession. Defs. Mot. at PageID.1857–1863.  This argument fails as to Kane.  But the Court grants Ortiz qualified immunity on this claim.

38

### i.      Clearly Established Constitutional Right

As an initial matter, Defendants do not challenge the clearly established prong of the qualified immunity analysis on this claim and, therefore, have waived or forfeited that issue.  See Howard v. Collins, No. 21-cv-12036, 2024 WL 5398545, at \*16 (E.D. Mich. Jan. 25, 2024), appeal dismissed, No. 24-1079, 2025 WL 429916 (6th Cir. Feb. 7, 2025) (stating that the defendants made no argument as to the clearly established prong, thereby waiving it).

Even if Defendants had not waived this argument, it fails on the merits.  The right to be free of coercion or fabrication in a confession is clearly established.  The Sixth Circuit has long recognized "an accused's confession must be 'made freely, voluntarily and without compulsion or inducement of any sort.'"  United States v. Binford, 818 F.3d 261, 271 (6th Cir. 2016) (quoting Haynes v. Washington, 373 U.S. 503, 513 (1963)).  It is also clearly established that "[t]he Fourteenth Amendment bars an officer from knowingly creating false evidence to obtain a conviction."  Sanford v. City of Detroit, 815 F. App'x 856, 859 (6th Cir. 2020).

### ii.      Evidence of Violation

Defendants argue that Calhoun has not shown the second qualified immunity prong, which requires that he set forth sufficient evidence that a jury could determine his confession was fabricated or coerced.

As an initial matter, Calhoun has not set forth evidence that Ortiz was involved in Calhoun's interrogation.  To survive summary judgment, a plaintiff must "point to sufficient record evidence to create a disputed issue of material fact as to whether [each individual officer] was personally involved in the conduct that violated the [plaintiff's constitutional rights]. . . This is because [e]ach defendant's liability must be assessed individually based on his own actions."  Fazica v. Jordan, 926 F.3d 283, 289 (6th Cir. 2019) (punctuation modified).  The only exception to this rule in the Sixth Circuit is when a plaintiff has difficulty identifying the perpetrator of the

allegedly unconstitutional acts. Id. That is not the situation here. Calhoun alleges that Kane, alone, conducted the interrogation that led to his allegedly false confession. Pl. Resp. at PageID.3205–3207. The Court grants Ortiz summary judgment as to the coerced confession claim.

This leaves only Kane as to this claim. "In determining whether a confession is involuntary due to police coercion, [the] court employs a three-step analysis: (i) the police activity was objectively coercive; (ii) the coercion in question was sufficient to overbear the defendant's will; (iii) and the alleged police misconduct was the crucial motivating factor in the defendant's decision to offer the statements." Binford, 818 F.3d at 271 (punctuation modified).

The basis of a fabrication of evidence claim under § 1983 is an allegation that a defendant "knowingly fabricated evidence against [a plaintiff], and [that] there is a reasonable likelihood that the false evidence could have affected the judgment of the jury." Mills v. Barnard, 869 F.3d 473, 484 (6th Cir. 2017) (punctuation modified). In cases such as this, which did not involve a jury conviction but instead involved a state court judge's acceptance of a plea, the Court can view whether the evidence affected the judgment of the trial court before which the plaintiff was convicted. See Sanford, 381 F. Supp. 3d at 919; and Sanford, 815 F App'x at 859. Fabricating evidence involves "the manufacture of damaging evidence." Id. at 485.

Kane does not organize his arguments according to any of the coercion or fabrication elements. Instead, he sets forth multiple fact-based reasons why he believes Calhoun has not shown a dispute of material fact as to coercion or fabrication on this issue, including the following:

- For over a decade, Calhoun consistently maintained that his confession was voluntary, including during his February 21, 2007 plea hearing an in his affidavit supporting dismissal of his appeal of right, Defs. Mot. at PageID.1858–1859.

- In more than 260 hours of recorded jail calls, Calhoun never alleged that Kane coerced him into confessing. Instead, the calls capture Calhoun boasting about taking the blame for the real perpetrator, which they contend demonstrates that Calhoun's confession was a conscious and voluntary decision, id. at PageID.1859–

1861.

- Kane was not one of Calhoun's arresting officers and did not direct the arresting officers to arrest Calhoun, id. at PageID.1861–1863.[18]

- During his January 2007 competency evaluation, Calhoun denied that any police officer had threatened him and denied that the conditions of his interrogation—such as hunger or fatigue—affected his confession. He also reiterated that he understood he had signed a confession, id. at PageID.1864–1867.

- Even if Kane made a "threat," it was not coercive, and there is no legal authority suggesting that a statement that officers could "make life harder" is sufficient to constitute coercion. Id. at PageID.1867.

None of these arguments suffices because they are simply countervailing evidence. Contrary evidence does not demonstrate the absence of disputed issues of fact; it confirms that disputes exist and precludes summary judgment.

### (a)  Coercion

As to the first coercion element—that the police activity was objectively coercive—Calhoun has met this showing. "Courts, including [the Sixth Circuit], recognize[] that a promise of lenient treatment or of immediate release may be so attractive as to render a confession involuntary." Monson v. City of Detroit, No. 22-2050, 2024 WL 84093, at *8 (6th Cir. Jan. 8, 2024) (punctuation modified) (affirming the district court's denial of qualified immunity based on the defendant officers' alleged use of false promises of leniency to obtain the plaintiff's confession). The promise need not be extreme to satisfy this standard. "Coercion… can include

---

[18] The Court is not clear what point Defendants are making with this argument. On one hand, this argument appears to be aimed at refuting Calhoun's contention in his complaint that Kane "advised" officers to arrest Calhoun. Defs. Mot. at PageID.1861. On the other hand, it might be addressing an incident that Defendants mention in their brief where Calhoun allegedly misidentified one of the arresting officers as "Kane." Id. at PageID.1863. All this is to say that, because this argument is unclear, whatever Defendants may have intended by it is not for the Court to construct. It is insufficient for a party to mention a "possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones." Buetenmiller v. Macomb Cnty. Jail, 53 F.4th 939, 946 (6th Cir. 2022).

so mild a whip as the refusal, under certain circumstances, to allow a suspect to call his wife until he confessed." Id.

As discussed in the background section, Calhoun has testified that, during his interrogation, Kane told him that he would make Calhoun's life harder if he did not confess, and that he would let Calhoun go home if he did confess. This is adequate to create a genuine issue of material fact as to the objectively coercive element.

Calhoun has also demonstrated the second element—that the coercion in question was sufficient to overcome his will. Calhoun presented evidence that he was 19 years old at the time. See MDOC Med. Intake Form at PageID.3963. Significantly, he has presented evidence that he suffered from documented cognitive impairments that affected his ability to understand risk in certain situations. See C. Vega Expert Rpt. at PageID.3931–3933; see also K. Scherr Expert Rpt. at PageID.4057–4058 (Dkt. 118-36). Calhoun has also shown that his ability to read and write was "minimal" in 2007, which indicates he may not have fully understood the statement that Kane wrote and he initialed and signed.[19] See 2/21/07 Competency Ltr. at PageID.4201. This is sufficient to create an issue of material fact as to whether the coercion was sufficient to overcome his will.

Calhoun also establishes the third factor—that the alleged misconduct was the crucial motivating factor in his decision to offer the statements. Calhoun testified that he signed the confession that Kane wrote so that he could "get it over with" after hearing Kane's promise that he could go home if he did so. Calhoun Dep. Tr. at PageID.3883. He also told the competency evaluator in 2007 that he signed the confession that was not true because he was scared that the

---

[19] It is uncontroverted that Calhoun did not write the confession himself; Kane wrote it, and Calhoun initialed and signed it. See Calhoun Stmt. at PageID.4195; see also Prelim. Exam. Tr. at PageID.3287.

police would hurt him and his family.  2/21/07 Competency Ltr. at PageID.4202–4203.  This is sufficient to establish the third coercion factor.  Because Calhoun has demonstrated a genuine dispute of material fact as to whether his confession was coerced, his claim survives Kane's qualified immunity argument.

### (b)  Fabrication

Calhoun has also established sufficient evidence to reach a jury that his confession was fabricated.  As to the first element—that Kane knowingly fabricated evidence against Calhoun— Calhoun argues that the confession contained several non-public details about the BH attack that only the perpetrator and police would know, but that Calhoun would not have otherwise known.  For example the confession states that: (i) BH was forced to perform oral sex on her attacker; (ii) the perpetrator attempted to anally penetrate her and that he put on a condom before the unsuccessful anal penetration attempt; (iii) the perpetrator did not ejaculate into the condom; and (iv) he threatened to hurt BH if she told anyone about the attack.  See Calhoun Stmt. at PageID.4195–4198; see also BH Stmt. at PageID.3326–3327.  Kane, as an investigator on the BH case, knew these non-public details.  Kane Dep. Tr. at PageID.3595.  Calhoun argues that because he was exonerated and the charges against him were dismissed, and the confession contained non-public details known only to the perpetrator and police, it is reasonable to infer that the details in the confession were fabricated.  Pl. Resp. at PageID.3228.

Calhoun relies on the case Ortiz v. Stambach, 137 F.4th 48 (2d Cir. 2025) for this proposition.  In Ortiz, the plaintiff was exonerated after serving a decade in prison.  Id. at 60.  He alleged in his § 1983 claim, in relevant part, that police fabricated his confession because the confession included non-public details that he could not have known because he was innocent of the crimes.  Id. at 57.  However, the plaintiff in Ortiz's order vacating his conviction, unlike

43

Calhoun's, found that the plaintiff was "actually innocent." Id. at 65. Calhoun's vacatur order does not do that. Thus, for Ortiz to apply, Calhoun would first have to demonstrate to a jury that he did not commit the assaults and second, that the non-public details of his confession were thus fabricated.

Calhoun argues that he can further demonstrate the confession was fabricated because it contains syntax that was beyond his capabilities. Pl. Resp. at PageID.3228. Calhoun's neuropsychology expert, Clemente Vega, prepared a report, which stated that Calhoun's "language and communication are markedly abnormal and characterized by frequent confabulation," which make the reliability and accuracy of the confession deserving of further review. C. Vega Rpt. at PageID.3935.

He argues that another reason he can demonstrate fabrication is because the confession contains details—such as that Calhoun used a fake gun that he gave to a friend Damon—that police would have followed up on, if they were true. Pl. Resp. at PageID.3228–3229. Calhoun gave Kane the location of Damon's house, but the police never followed up. Id. He argues that a jury could find that Kane did not do so because he would not have wasted time "looking for a gun [police] knew wasn't there." Id. For all of these reasons, Calhoun has set forth sufficient evidence to establish the first fabrication factor—that Kane knowingly fabricated the confession.

The second fabrication of evidence factor—that there is a reasonable likelihood that the false evidence "formed a critical piece of the evidence used to charge and convict" the plaintiff—is also met. See Sanford, 381 F. Supp. 3d at 918–919, aff'd sub nom. Sanford, 815 F. App'x 856 (finding that a sketch that the defendants misrepresented as the plaintiff's own work had been presented to the prosecutor when deciding to charge the case and before the plea was taken, and that the evidence unquestionably affected the judgment of the trial court before which the plaintiff

44

was convicted). Here, the prosecutor Louisa Papalas testified that, among other evidence, she was swayed by Calhoun's admissions. Papalas Dep. Tr. at PageID.3490. This is sufficient to satisfy the second fabrication of evidence factor.

The Court rejects Kane's arguments that Calhoun has not raised an issue of material fact that his confession was coerced or fabricated. For these reasons, Kane's qualified immunity argument on this claim fails. Calhoun has demonstrated sufficient evidence to raise an issue of material fact as to both coercion and fabrication of his confession against Kane.

### c. Fabricated Photo Lineup Claim

Defendants' final qualified immunity argument regards Calhoun's claim that the photo lineup was unfairly suggestive and fabricated. Defs. Mot. at PageID.1863–1869. The Court agrees with Defendants.

### i. Clearly Established Constitutional Right

Defendants again fail to challenge the "clearly established" prong of the qualified immunity analysis, and they have, therefore, forfeited or waived this argument. See Howard, 2024 WL 5398545, at *16. Nor could they prevail in any event. "Criminal suspects have a constitutional right to be free from identification procedures so unnecessarily suggestive and conducive to irreparable mistaken identification that the identification's use violates due process of law." Gregory, 444 F.3d at 746 (punctuation modified). The right to be free of an unnecessarily suggestive identification is thus clearly established.

### ii. Evidence of Violation

Defendants argue that Calhoun has not set forth evidence, for the purposes of overcoming their qualified immunity argument, that the photo lineup with MV and BH was unconstitutionally suggestive and coercive. The Court agrees for the reasons that follow.

45

As an initial matter, Calhoun does not present evidence that Kane was involved in the photo lineup.  Again, it is Calhoun's burden to point to sufficient record evidence as to each individual officer's personal involvement in the conduct that violated his constitutional rights.  Fazica, 926 F.3d at 289.  Calhoun's allegations regarding the photo lineup involve only Ortiz, not Kane.  See Pl. Resp. at PageID.3207–3213.  The Court grants Kane summary judgment as to the photo lineup claim.

This leaves only Ortiz.  The Sixth Circuit has established a two-step inquiry for analyzing whether a suggestive identification procedure violated due process of law: (1) "whether the identification was unnecessarily suggestive" and (2) if so, then the court should analyze "whether the evidence was nevertheless reliable despite the impermissible suggestiveness of the identification procedure."  Haliym v. Mitchell, 492 F.3d 680, 704 (6th Cir. 2007).

Ortiz does not cite to this test or analyze either factor in his motion.  Instead, he argues that, under Michigan law, Calhoun could have requested a Wade hearing, which, he explains, is a pretrial hearing in which a criminal defendant can contest the validity of an out-of-court identification.  Defs. Mot. at PageID.1867–1868.  The implication of this argument is that Calhoun waived his right to challenge the photo identification because he never requested a Wade hearing in 2007.  But Ortiz never actually makes this argument.  Instead, he merely explains what a Wade hearing is and states that Calhoun did not request one, without explaining why that is relevant to the qualified immunity claim.  Id.  Ortiz has forfeited or waived whatever argument he intended to make because a party cannot make a partial argument and then "leav[e] the court to . . . put flesh on its bones."  Buetenmiller, 53 F.4th at 946.  Nevertheless, to the extent this argument is another effort at an estoppel or waiver argument, the Court rejects it for the reasons stated above relative to collateral estoppel and the nolo contendre plea.

Because Ortiz has asserted that qualified immunity applies to Calhoun's impermissibly suggestive photo lineup claim, it is Calhoun's burden to demonstrate that there is a genuine issue of material fact. He has not done so.

Calhoun has not set forth sufficient evidence to satisfy the two-step inquiry under Haliym, 492 F.3d at 704. As to the first step—whether the identification was impermissibly suggestive—Calhoun argues that Daniel Finwall, the attorney appointed to observe the photo lineup, testified that he did not remember receiving any training on his role and responsibility in photo lineups. Finwall Dep. Tr. at PageID.4323–4324. Nor did he remember any guidelines or rules regarding how lineups are conducted. Id. at PageID.4324. But even if Finwall was not well trained or ineffective in detecting suggestive tactics, that would not establish that suggestive tactics were used. Calhoun has not presented any evidence that Finwall's training, or lack thereof, made it more likely that Ortiz told MV and BH who to choose in the photo lineup or took other suggestive actions.

Nor is the Court persuaded by Calhoun's argument that "this case involves two young girls who were attacked by different people, and who described different assailants, but who Defendants brought together to identify the same person—Plaintiff (who is innocent). Plaintiff has developed expert evidence that MV and BH would not have coincidentally identified the same, innocent person: Their false identifications were the result of 'external influence.'" Resp. at PageID.3233–3234.

While it may be true that the victims described assailants who did not precisely match Calhoun, this does not support an inference that Ortiz made improper suggestions to them. Nor does Calhoun's expert's opinion lead to such a conclusion. Her view that suggestive identification procedures would "easily account" for the erroneous identification of Calhoun does not set forth

47

any basis for concluding Ortiz made improper suggestions or even what they allegedly were.  See

Dysart Rpt. at PageID.4243 (Dkt. 118-43). And the expert's opinion that "it is possible that

[Calhoun] was selected due to external influences including verbal and non-verbal suggestions

during the identification procedure," id. at PageID.4231–4232, does not point to any evidence that

Ortiz was the "external influence."[20]

Because Calhoun has not satisfied the first Haliym element, the Court need not evaluate

the second prong.  Calhoun has not met his burden of demonstrating evidence of a constitutional

violation under Haliym and, therefore, Ortiz is entitled to qualified immunity on the unduly

suggestive identification claim.  Summary judgment is granted in favor of both Kane and Ortiz on

this claim.

### 4.  CODIS Database Availability

Defendants' next argument is unclear.  They begin this section of their motion by

explaining that, when the CODIS database was initially developed, it contained only the DNA of

convicted offenders. Defs. Mot at PageID.1869–1870.  In 2015, the State of Michigan began using

the CODIS database for all arrested individuals. Id. at PageID.1870.  Logically, therefore, the

database would likely contain more data after 2015.  Defendants do not explain why this matters

to this case.

---

[20] The expert cites to two other, unrelated cases involving allegations that Ortiz fabricated photo lineups by improperly suggesting whom the witness should identify.  See Mullins v. McKee, No. 2:11-cv-14678, 2018 WL 339899 (E.D. Mich. Jan. 9, 2018); see also, People v. Anthony, No. 300212, 2013 WL 2494982 (Mich. Ct. App. June 11, 2013).  The reported accusations are non-admissible hearsay and cannot properly considered. Wiley v. United States, 20 F.3d 222, 226 (6th Cir. 1994) ("[H]earsay evidence cannot be considered on a motion for summary judgment").  And notably, neither of the courts in those cases concludes that Ortiz actually engaged in improper suggestion tactics.

Defendants also make an unclear argument about the information available in the Michigan Offender Tracking System (OTIS) database about Ralph Tucker. Id. at PageID.1870. Tucker is the individual whom Calhoun alleges is the perpetrator of the attack on MV, based on the OTIS database's indication he had a puzzle tattoo. Id. at PageID.1870–1871.

From what the Court can tell, Defendants may be arguing that the information in these databases does not demonstrate who the actual perpetrators were in 2006. But Defendants do not explain why it is material in this case to determine who the perpetrators were in 2006. That issue is distinct from an issue that appears to be material – whether Calhoun was the perpetrator. Because Defendants have not explained what relief they seek through this portion of their motion, the Court rejects this argument. See Buetenmiller, 53 F.4th at 946.

### 5. Fabricated Polygraph Report

Defendants argue that the Court should grant them summary judgment on Calhoun's claim against Muhammad alleging fabrication of the polygraph report.[21] The Court agrees.

The Sixth Circuit recognizes fabrication of evidence claims under the Fourth and Fourteenth Amendments. Clark v. Abdallah, 131 F.4th 432, 447 (6th Cir. 2025). "The Fourth Amendment is violated when probable cause rests on fabricated evidence presented to a grand jury or to a judge determining probable cause." Id. And the Fourteenth Amendment is infringed "when the prosecution presents evidence that is knowingly fabricated and a reasonable likelihood exists that the false evidence" id., was used to "procure the conviction and imprisonment of a defendant." Sanford, 381 F. Supp. 3d at 918.

---

[21] Calhoun's allegations involving the polygraph report involve Muhammad only – not Ortiz or Kane. Compl. at ¶¶ 80–81; See Pl. Resp. at PageID.3250–3251. Muhammad seeks summary judgment on this claim, although he does not invoke qaulified immunity.

Defendants argue, correctly, that the polygraph report was not part of the record at Calhoun's preliminary examination.  Defs. Mot. at PageID.1872–1873.  Therefore, Calhoun has not—and cannot—show that the report was part of the judge's probable cause finding or would have affected the judge's acceptance of Calhoun's plea.  See Prelim. Exam. Tr. at PageID.3259–3299.  Because Calhoun cannot meet the essential elements of either a Fourth or Fourteenth Amendment fabrication claim, summary judgment is granted to Defendants.

The Court rejects Calhoun's argument that, "if" he can demonstrate "the prosecutor was influenced" by the polygraph report, then he can maintain this claim.  Pl. Resp. at PageID.3250–3251 (emphasis in original).  Calhoun does not cite any cases in support of this argument.  The time for Calhoun to support his fabrication claim is now—in response to Defendants' summary judgment motion.  See Celotex, 477 U.S. at 325–326.  Instead of supporting his position, Calhoun admits that "a plausible view of the evidence is that the prosecutor was not influenced" by the polygraph report.  Id. (emphasis in original).

Calhoun's polygraph fabrication claim fails because it is unsupported.  Muhammad's motion is granted as to this claim.

### III.    CONCLUSION

For the reasons set forth above, the Court grants Calhoun's motion for partial summary judgment (Dkt. 97) and grants in part and denies in part Defendants' motion for summary judgment (Dkt. 106).  The Court concludes as follows.

- The doctrine in Heck does not bar Calhoun's claim.  The Court grants him summary judgment on this issue.

- In doing so, it denies Defendants' arguments regarding the Heck doctrine, the applicability of collateral estoppel, and the nolo contendre plea.

- It denies Kane and Ortiz qualified immunity as to the suppression of DNA evidence claim.

- It denies Kane qualified immunity as to the coerced confession claim.

- It grants Ortiz qualified immunity as to the coerced confession claim.

- It grants Kane and Ortiz qualified immunity as to the photo lineup claim.

- It denies Defendants any relief based on their argument regarding CODIS database availability.

- It grants Muhammad summary judgment as to the polygraph-based claim.

**SO ORDERED.**

Dated: March 25, 2026                    s/Mark A. Goldsmith
Detroit, Michigan                      MARK A. GOLDSMITH
                                      United States District Judge

**CERTIFICATE OF SERVICE**

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First-Class U.S. mail addresses disclosed on the Notice of Electronic Filing on March 25, 2026.

                                      s/Joseph Heacox
                                      JOSEPH HEACOX
                                      Case Manager