**Miller v. Gettel, Not Reported in Fed. Rptr. (2023)**

2023 WL 2945340

2023 WL 2945340
Only the Westlaw citation is currently available.
United States Court of Appeals, Sixth Circuit.

Kerry MILLER, Plaintiff-Appellee/Cross-Appellant,
v.
Gina GETTEL and W. Mark Fondren, in their individual
capacities, Defendants-Appellants/Cross-Appellees,
Intoximeters, Inc., Defendant-Cross-Appellee.

No. 22-1034/1046
|
FILED April 14, 2023

ON APPEAL FROM THE UNITED STATES DISTRICT
COURT FOR THE FOR THE EASTERN DISTRICT OF
MICHIGAN

**Attorneys and Law Firms**

Zachary T. Runyan, Runyan Law Group, St. Clair Shores,
MI, for Plaintiff-Appellee/Cross-Appellant in Nos. 22-1034,
22-1046.

John G. Fedynsky, Office of the Attorney General, Lansing,
MI, for Defendants-Appellants/Cross-Appellees in Nos.
22-1034, 22-1046.

G. Gus Morris, McGraw Morris, Troy, MI, Paul Louis
Brusati, Jonathan R. Shulan, Armstrong Teasdale, St. Louis,
MO, for Defendant-Cross-Appellee in No. 22-1046.

Before: GUY, WHITE, and LARSEN, Circuit Judges.

GUY, J., delivered the opinion of the court in which WHITE
and LARSEN, JJ., joined. LARSEN, J. (pp. —— – ——),
delivered a separate concurring opinion.

OPINION

RALPH B. GUY, JR., Circuit Judge.

**\*1** Miller pleaded guilty to a drunk-driving offense based
on the results of a breath alcohol test that was performed
using a device that had not been properly certified one month
earlier. Miller seeks damages for deprivation of his Fourteenth
Amendment rights in violation of 42 U.S.C. § 1983, and in
tort for negligence and fraudulent misrepresentation under
Michigan law. The district court granted in part and denied in

part the defendants' motions to dismiss the complaint. After
review of the MSP Defendants' appeal and Miller's cross-
appeal, we affirm in part, reverse in part, and remand only
Miller's negligence claims for further proceedings consistent
with this opinion.

I.

A.

On March 10, 2019, Kelly Miller was sitting alone in his
vehicle in the parking lot of a McDonald's in Tecumseh,
Michigan. Compl. ¶ 50. Officers from the Tecumseh Police
Department stopped, approached Miller, and asked Miller if
he had been drinking alcohol. Compl. ¶ 51. Miller responded
that he had consumed only two beers at least two or three
hours earlier. Compl. ¶ 52. Miller heard the officer say he did
not smell alcohol, but then the officer turned on his camera
and said that he did. Compl. ¶ 53-54. The officer administered
a preliminary breathalyzer test and a sight test, advised Miller
that he had failed the tests, and arrested Miller for operating a
vehicle while intoxicated (OWI). Compl. ¶ 55-57. The arrest
itself is not challenged here.

At the Tecumseh Police Department, officers performed a
breath alcohol test using the DataMaster DMT device located
there. Compl. ¶ 57. Miller saw that the results showed a blood
alcohol concentration (BAC) of .13% (*i.e.*, an amount in
excess of the limit of .08% under Michigan law). Compl. ¶ 57;
*see also* MICH. COMP. LAWS § 257.625(a)–(b). Transported
to the Lenawee County Jail, Miller was booked, held 3 ½
hours, and released after another preliminary breathalyzer test
showed a BAC of .02%. Compl. ¶ 57-58. Charged with OWI
on March 25, 2019, Miller retained counsel and pleaded guilty
on May 14, 2019. Compl. ¶ 59-61. Miller received a non-
custodial sentence subject to significant conditions on June
28, 2019. Compl. ¶ 61. [1]

But on January 16, 2020, Miller's conviction was dismissed
by entry of a Nolle Prosequi Order with the notation "due
to Data[M]aster issue." Compl. ¶ 69. The Lenawee County
Prosecutor sought dismissal within days of receiving a letter
from MSP Sergeant Gina Gettel advising that twelve cases
—including Miller's case—were affected by breath alcohol
tests performed using the DataMaster DMT device "located
at the Tecumseh Police Department between February 15,
2019 and June 28, 2019." Compl. ¶ 62. Specifically, Gettel's

letter allegedly explained that the DataMaster DMT used to conduct those tests "did not pass all required checks during the onsite 120-day inspection that was completed on February 15, 2019." Compl. ¶ 63.

### B.

**\*2** Approximately 300 DataMaster DMTs—infrared breath alcohol testing instruments—were purchased by the State of Michigan in 2011. Compl. ¶ 23. Since then, test results from the DataMaster DMTs have been used all over Michigan "as a main piece of evidence for prosecutors to prove guilt for OWI charges." Compl. ¶ 23. Intoximeters, Inc., took over the service contract for those devices in 2013, and entered into a new three-year service contract with the State of Michigan effective September 1, 2018. Compl. ¶ 24, 26.

"Schedule A" of that new contract obligated Intoximeters to hire at least three certified technicians to conduct 120-day certifications for all of the DataMaster DMTs, service and maintain all of the DataMaster DMTs, and provide expert testimony as needed with respect to the maintenance of all of the DataMaster DMTs. Compl. ¶ 26. The contract also designated Gina Gettel as the Program Manager responsible for monitoring and coordinating day-to-day activities. Compl. ¶ 27. John Does 1-3 were the technicians that Intoximeters hired, upon the approval of the MSP, in the fall of 2018. Compl. ¶ 29. [2]

In January 2019—before Miller's arrest—the MSP decided to align the breath alcohol testing program with forensic laboratory standards and work toward national accreditation. Compl. ¶ 30. "The accreditation process was expected to take at least eighteen months." Compl. ¶ 31; *see also* MSP Press Release 1/16/2020, p. 2 (same). [3] The MSP created the position of Breath Alcohol Technical Leader and hired Mark Fondren to serve in that role. Compl. ¶ 31.

In April 2019—after Miller was charged but before he pleaded guilty—the MSP imposed "additional workflow requirements" on Intoximeters "to ensure compliance with state law and administrative rules and move toward accreditation." Compl. ¶ 32; *see also* MSP Press Release 1/16/2020, p. 2 (same). Miller's complaint alleges that: "According to MSP's website, it was *after* these additional controls were put in place that MSP detected problems with the DataMaster DMTs." Compl. ¶ 32 (emphasis added); *see also* MSP Press Release 1/16/2020, p. 2 ("the MSP began to

notice noncompliance by the vendor's technicians"). Miller alleges that, despite this knowledge, "no comprehensive audit of Intoximeters' work was performed." Compl. ¶ 34. Miller pleaded guilty on May 14, 2019.

In August 2019—after Miller's sentencing—the State sent Intoximeters a letter "outlining grounds for breach of contract," "requesting a corrective action plan," and threatening "termination of the contract." Compl. ¶ 34-35 ("Since contract inception, there have been substantial performance issues related to timely certification of Data[M]aster Instruments and failure of your employees to comply with basic security protocols."). Miller specifically alleges that the improper actions identified in that letter included: (1) "[f]ailure to perform timely 120-day certifications in 60 instances"; (2) "[i]ncorrect recording of important elements during instrument checks" (*i.e.*, dry gas lot numbers and expiration dates); and (3) "[s]haring instrument passwords with jail staff." Compl. ¶ 36; *see also* MSP Press Release 1/16/20, p. 2 (same). Although the MSP accepted Intoximeters' corrective action plan a few weeks later, Miller alleges that "nothing changed with respect to the continued unlawful conduct by the Intoximeters' employees." Compl. ¶ 38.

**\*3** That is, through January 2020, the "MSP became aware of repeated instances of unlawful conduct regarding the maintenance and certification of DataMaster DMTs in or by at least seven law enforcement locations." Compl. ¶ 39. More specifically, Miller alleges that the unlawful conduct affected the DataMaster DMT devices at eight law enforcement locations. Compl. ¶ 43; *see also* MSP Press Release 1/16/2020, p. 1 (same). In early January 2020, the MSP found irregularities in documentation relating to a DataMaster DMT located at the Alpena County Sheriff's Department that were "the result of the technician fabricating the paperwork for a required test that was not performed on the instrument." MSP Press Release 1/16/2020, p. 3.

The MSP issued a "stop work" order to Intoximeters, and further review of records obtained from Intoximeters' technicians "yield[ed] additional discrepancies involving a second technician and three more impacted instruments (Beverly Hills PD, Pittsfield Township PD, and *Tecumseh PD*)." MSP Press Release 1/16/2020, p. 4 (emphasis added). As of January 16, 2020, the MSP reported that discrepancies had been identified involving DataMaster DMTs at eight locations (including Tecumseh PD) and specified: (1) the periods of time each was affected (from 2/15/19 to 6/28/19

Case 2:24-cv-10184-MAG-DRG ECF No. 141-5, PageID.6656 Filed 04/15/26 Page 3 of 11

Miller v. Gettel, Not Reported in Fed. Rptr. (2023)

2023 WL 2945340

for Tecumseh PD), (2) the number of tests impacted for each location (twelve for Tecumseh PD), and (3) whether the discrepancies involved possible criminal acts (yes for Tecumseh PD). *See* MSP Press Release 1/16/20, p. 1. The MSP began a criminal investigation into potential fraud committed by employees or contractors of Intoximeters. Compl. ¶ 48; *see also* MSP Press Release 1/16/20, p. 3 (same). [4] Miller alleges that he was reimbursed for some but not all of his out-of-pocket expenses after entry of the Nolle Prosequi Order. Compl. ¶ 68. This action was filed a year later against MSP Sgt. Gettel, MSP Breath Alcohol Technical Leader Fondren, Intoximeters, Inc., and three John Doe Intoximeters technicians.

C.

Miller's complaint alleges that, "before and after MSP requested a [corrective action plan] from Intoximeters, Defendants committed serious, unlawful errors, which in some cases according to MSP may have constituted fraud, with respect to the calibration, accuracy, maintenance, and/or certification of DataMaster DMTs, as well as the training supervision and oversight of at least the Doe Defendants, whose main duties were to maintain DataMaster DMTs in Michigan." Compl. ¶ 40. Alleging that defendants understood that test results would be used as evidence in criminal prosecutions, Miller claims that this unlawful conduct, "including a complete lack of supervision or oversight, caused innocent citizens to be arrested, jailed, prosecuted, criminally convicted, and subjected to fines, surcharges, terms of probation and, in some cases, additional jail time." Compl. ¶ 41-42.

The § 1983 claims assert generally that the defendants violated Miller's due process rights by 1) fabricating evidence, 2) suppressing evidence, 3) failing to intervene in those violations, and 4) failing to train and supervise so as to prevent those violations. The district court dismissed all of the § 1983 claims against Intoximeters, Inc., because it was not acting under the color of state law. Qualified immunity was denied to Gettel and Fondren as to the first three due process claims, but granted as to the fourth claim. The district court also dismissed the state-law fraudulent misrepresentation and negligence claims, except for the negligence claim against Gettel and Fondren. *See generally Miller v. Gettel*, 575 F. Supp. 3d 846 (E.D. Mich. 2021).

**\*4** We have jurisdiction to review the denial of qualified immunity and state governmental immunity to the extent that the issues presented are purely legal questions. *See Peterson v. Heymes*, 931 F.3d 546, 552-53 (6th Cir. 2019). Miller's cross-appeal would ordinarily be limited to issues that are " 'inextricably intertwined' with matters over which the appellate court properly and independently has jurisdiction." *Williams v. Maurer*, 9 F.4th 416, 428 (6th Cir. 2021) (citation omitted). Here, however, the district court has certified the dismissed claims for interlocutory appeal. *See* FED. R. CIV. P. 54(b); *Good v. Ohio Edison Co.*, 104 F.3d 93, 95 (6th Cir. 1997); *Rodriguez v. City of Cleveland*, 439 F. App'x 433, 458 (6th Cir. 2011) (finding jurisdiction over premature cross-appeal where the district court granted a Rule 54(b) certification). There is no reason to doubt that the Rule 54(b) certification was proper because the district court's order resolved fewer than all of the claims and found "no just reason for delay." *See Gavitt v. Born*, 835 F.3d 623, 638 (6th Cir. 2016).

II.

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). This court construes the complaint in the light most favorable to plaintiff but is "not bound to accept as true a legal conclusion couched as a factual allegation." *Id.* (quoting *Twombly*, 550 U.S. at 555). Also, in testing the factual sufficiency of the complaint, we may consider exhibits attached to the complaint or motion to dismiss, public records, or items appearing in the record, "so long as they are referred to in the complaint and are central to the claims contained therein." *Gavitt*, 835 F.3d at 640; *see also Kreipke v. Wayne State Univ.*, 807 F.3d 768, 774 (6th Cir. 2015). Here, because Miller's complaint expressly relies on the MSP's January 2020 Press Release, we consider the information contained therein to be part of the pleadings. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556).

III.

Miller v. Gettel, Not Reported in Fed. Rptr. (2023)

2023 WL 2945340

Section 1983 provides a remedy against any person acting under color of state law who subjects or causes a person to be subjected "to the deprivation of any rights, privileges, or immunities secured by the [U.S.] Constitution and laws." 42 U.S.C. § 1983. For the reasons that follow, we conclude that Intoximeters was not acting under color of state law and that qualified immunity bars all of the due process claims asserted against Gettel and Fondren.

### A.

As a private entity, Intoximeters may qualify as a state actor if its "conduct is 'fairly attributable to the State.' " *Filarsky v. Delia*, 566 U.S. 377, 383 (2012) (quoting *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937 (1982)). This court generally recognizes four tests for determining whether a private entity has acted under color of state law for purposes of liability under § 1983. *See Marie v. Am. Red Cross*, 771 F.3d 344, 362 (6th Cir. 2014). Here, Miller relies on two of those tests—the public function and nexus tests—neither of which is satisfied here.

Under the public function test, "a private entity may qualify as a state actor when it exercises 'powers traditionally exclusively reserved to the State.' " *Manhattan Cmty. Access Corp. v. Halleck*, 139 S. Ct. 1921, 1928 (2019) (quoting *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 352 (1974)). "It does not suffice that the state agency 'exercised the function in the past' or that the 'function serves ... the public interest in some way' or that the entity charges the State for the service." *Howell v. Father Maloney's Boys' Haven, Inc.*, 976 F.3d 750, 752 (6th Cir. 2020) (quoting *Halleck*, 139 S. Ct. at 1928-29). Miller asserts that "the procuring of evidence through forensic testing has traditionally been the exclusive prerogative of the State of Michigan." (2d Br., p. 41.) On the contrary, Miller offers nothing to suggest that forensic testing is one of the very few functions that are "traditionally *and* exclusively performed" by government. *Halleck*, 139 S. Ct. at 1929. Besides, it is clear that Intoximeters' technicians did not actually do forensic testing, and Miller does not argue that the *servicing* of forensic equipment itself qualifies as a public function.

**\*5** Nor is the nexus or entwinement test satisfied. The former asks whether "there is a sufficiently close nexus between the state and the challenged action of the regulated entity so that the action of the latter may be fairly treated as that of the state itself." *Wilcher v. City of Akron*, 498 F.3d 516, 520 (6th Cir. 2007) (quoting *Wolotsky v. Huhn*, 960 F.2d 1331, 1335 (6th Cir. 1992)). For entwinement, the question is "whether the 'nominally private character' of the private entity 'is overborne by the pervasive entwinement of public institutions and public officials in its composition and workings [such that] there is no substantial reason to claim unfairness in applying constitutional standards to it.' " *Marie*, 771 F.3d at 364 (citation omitted alteration in original); *see also Brentwood Acad. v. Tenn. Secondary Sch. Athl. Ass'n*, 531 U.S. 288, 294, 300-02 (2001).

Miller argues that he has alleged sufficient nexus or entwinement based on the obligations imposed on Intoximeters under the contract. Specifically, Intoximeters was required to get the MSP's approval of the technicians it hired, obtain the MSP's approval prior to delegating any work to others, have its work subject to inspection and testing by the MSP, and provide its services to users during specified hours of the week. Intoximeters also was expected to comply with government regulations, train users of the devices, and ensure reliability of the DataMaster DMTs. But it is not enough "that the parties have a contractual relationship, even when that contract subjects the private actor to an 'extensive and detailed' set of requirements." *M.S. by Covington v. Hamilton Cnty. Dept. of Educ.*, 756 F. App'x 510, 514 (6th Cir. 2018) (quoting *Wolotsky*, 960 F.2d at 1336).

Rather, Miller must show that "the state 'played a role in the decision' made by [Intoximeters] that led to the deprivation of [Miller's] rights," such as by showing "that the contract necessitated [Intoximeters'] decision or that the state actors were involved in the decision." *Id.* (quoting *Wolotsky*, 960 F.2d at 1336); *see also Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 51 (1999). Here, Intoximeters' contract certainly did not necessitate the actions that led to alleged deprivations of due process; nor is there any claim that the MSP defendants participated in the misconduct by the Intoximeters' technicians. This is why Miller's reliance on the finding of state action in *Cahoo* is misplaced. There, the private entities designed, implemented, and administered an unconstitutional fraud detection system that operated as intended and with the direct involvement of State employees. *See Cahoo v. SAS Inst., Inc.*, 322 F. Supp. 3d 772, 792-93 (E.D. Mich. 2018), *aff'd in part and rev'd in part on other grounds*, 912 F.3d 887 (6th Cir. 2019).

Finally, in the alternative, Miller argues that he need not demonstrate state action because Intoximeters "willfully participate[d] in joint action with state agents." *Memphis,*

2023 WL 2945340

*Tenn. Area Local Am. Postal Workers Union, AFL-CIO v. City of Memphis*, 361 F.3d 898, 905 (6th Cir. 2004). This joint-action theory fails to save the day because Miller did not bring a claim for civil conspiracy to violate § 1983. Even if that were not so, the complaint does not plausibly allege that Intoximeters and the MSP Defendants "shared a conspiratorial objective" to deprive Miller of his constitutional rights. *Jackson v. City of Cleveland*, 925 F.3d 793, 817 (6th Cir. 2019) (quoting *Robertson v. Lucas*, 753 F.3d 606, 622 (6th Cir. 2014)). The § 1983 claims against Intoximeters were properly dismissed.

### B.

As for qualified immunity, Gettel and Fondren are "shield[ed] from money damages unless [Miller] pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). And, although a defendant ordinarily bears the burden of proof on an affirmative defense, Miller bears the burden to overcome qualified immunity from suit under § 1983. *See Crawford v. Tilley*, 15 F.4th 752, 760 (6th Cir. 2021) (citing *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)). That means we must apply the same de novo standards in reviewing the denial of qualified immunity as we do when reviewing the grant of qualified immunity. *Heyne v. Metro. Nashville Pub. Sch.*, 655 F.3d 556, 562 (6th Cir. 2011); *see also Robertson*, 753 F.3d at 614. We address each of Miller's Fourteenth Amendment due process claims in turn.

**\*6** *1. Fabrication of Evidence.* "The Fourteenth Amendment bars an officer from knowingly creating false evidence to obtain a conviction." *Sanford v. City of Detroit*, 815 F. App'x 856, 859 (6th Cir. 2020); *see also Jackson*, 925 F.3d at 815-16. "A plaintiff does not need to show that the government lacked probable cause to prevail on a fabrication of evidence claim." *France v. Lucas*, 836 F.3d 612, 629 (6th Cir. 2016). But Miller must plausibly allege that his "*own* rights were violated, and that the violation was committed *personally* by the defendant." *Robertson*, 753 F.3d at 615 (emphasis in original); *see also Heyne*, 655 F.3d at 564 (explaining that absent a conspiracy, the acts of one defendant cannot be ascribed to each of the defendants).

The only evidence Miller claims was fabricated is the evidential breath alcohol test performed at the Tecumseh

Police Department after Miller's arrest on March 10, 2019. There is no suggestion that the result was manipulated, misrepresented, or fabricated by the officer who conducted the test. Miller's claim is that the test result was inaccurate or unreliable because the subject DataMaster DMT device was left in service even though it had not passed all required checks during the onsite 120-day inspection completed on February 15, 2019. Miller alleges that the subject device was out of compliance from February 15, 2019 through June 28, 2019. And, in early January 2020, the MSP reported that its investigation into other discrepancies revealed the defective certification of the subject DataMaster DMT.

Miller does not allege that Gettel or Fondren were personally involved either in the deficient inspection of the subject device on February 15, 2019, or in the decision to leave the device in service after February 15, 2019. *See, e.g.*, *Mills v. Barnard*, 869 F.3d 473, 484-85 (6th Cir. 2017) (finding plausible claim against a DNA analyst who performed DNA testing and falsely reported the results as consistent with guilt); *Jackson*, 925 F.3d at 816 (affirming the denial of summary judgment where jury could infer the officer drafted or assisted in drafting a false witness statement). Rather, Miller's claim is that "*once* Defendants Gettel and Fondren became aware that the subject machine was not accurate, a failure to inform Tecumseh Police or Lenawee County Prosecutors that the machine was not accurate, [was] tantamount to providing fabricated evidence." (2d Br., p. 21 (emphasis added).) However, we need not decide whether these allegations would state a clearly established fabrication-of-evidence claim because Miller has not plausibly alleged that either Gettel or Fondren were aware that the subject device had failed inspection *before* it was used to test Miller's breath on March 10, 2019 (*i.e.*, so as to have knowingly created a false test result).

To be sure, the complaint does contain the conclusory allegation that "the Defendants knew at the time of these [twelve] arrests that the DataMaster DMT (instrument no. 300341) had not passed certification." Compl. ¶ 65. For facial plausibility, however, Miller must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556). We can infer from the well-pled facts that an unnamed Intoximeters technician performed a deficient (if not fraudulent) onsite inspection rendering the subject DataMaster DMT possibly unreliable or inaccurate, but nonetheless allowed that device to remain in service from February 15, 2019, through June 28,

2019. One can infer from this that the technician knew faulty or unreliable evidence could result. But can the same be said of Gettel and Fondren?

**\*7** Gettel and Fondren allegedly knew that results from DataMaster DMT devices would be used as evidence in criminal prosecutions; knew that each DataMaster DMT was provided to local authorities "under a guise that the machine was accurate and reliable"; and "Gettel and Fondren were the individuals tasked with overseeing that the DataMaster DMT machines were maintained in such a manner." (2d Br., p. 21.) But responsibility for overseeing all of the DataMaster DMTs is not the same as knowledge of the specific defective inspection of the DataMaster DMT used to test Miller's breath. At best, Miller alleges that Gettel and Fondren became aware of *general* deficiencies in the work of Intoximeters' technicians sometime after the workflow requirements were imposed in April 2019. Indeed, the complaint specifically faults the MSP Defendants for failing to conduct a comprehensive audit that could have revealed that the subject DataMaster DMT had not passed the onsite 120-day inspection completed on February 15, 2019. And, according to the MSP's Press Release, it was in January 2020 that the MSP's investigation into misconduct relating to other devices uncovered evidence of the faulty inspection of the subject DataMaster DMT. Miller alleges that Gettel advised the Lenawee County Prosecutor in a January 13, 2020 letter, but offers no factual basis for concluding that either Gettel or Fondren were aware of the defective inspection *before* the allegedly fabricated evidence was created on March 10, 2019. Gettel and Fondren are entitled to qualified immunity as to the due process claim that they knowingly created or assisted in creating false evidence to obtain Miller's conviction.

*2. Suppression of Evidence.* "[S]uppression by the prosecution of evidence favorable to an accused ... violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady v. Maryland*, 373 U.S. 83, 87 (1963). The elements of a *Brady* claim are that: (1) the evidence is favorable to the accused, (2) the "evidence must have been suppressed by the State, either willfully or inadvertently," and (3) prejudice resulted. *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999). Also, "police can commit a constitutional deprivation analogous to that recognized in *Brady* by withholding or suppressing exculpatory material" from the prosecution. *Moldowan v. City of Warren*, 578 F.3d 351, 379 (6th Cir. 2009).

Miller complains that Gettel and Fondren suppressed evidence that the subject DataMaster DMT device had failed its inspection on February 15, 2019. (2d Br., p. 25.) That such evidence was favorable to Miller is plain where it is alleged that the prosecutor sought a Nolle Prosequi Order within days of being so advised. The district court denied qualified immunity because Gettel and Fondren "were aware of general deficiencies with the DataMaster DMTs at least as early as April 2019, but did not share that knowledge with local authorities, allowing Miller's prosecution to continue uninterrupted until he eventually entered a guilty plea and was sentenced." *Miller*, 575 F. Supp. 3d at 863.

The Supreme Court has held that "the Constitution does not require the Government to disclose material *impeachment* evidence prior to entering a plea agreement with a criminal defendant." *United States v. Ruiz*, 536 U.S. 622, 633 (2002) (emphasis added). But *Ruiz* did not address whether the same is also true for *exculpatory* evidence, and the circuits are divided or undecided on that question. *See Robertson*, 753 F.3d at 622; *see also United States v. Harshman*, No. 19-35131, 2021 WL 3929926, at \*2-4 (9th Cir. 2021) (Nelson, J., concurring) (citing circuit cases). [5] In the § 1983 context, however, we have held that there is no "clearly established obligation to disclose exculpatory *Brady* material to the prosecutors in time to be put to effective use in plea bargaining." *Robertson v. Lucas*, 753 F.3d 606, 621-22 (6th Cir. 2014). Because under *Robertson* a right to pre-plea disclosure of exculpatory evidence was not clearly established when Miller pleaded guilty, the district court erred in denying qualified immunity to Gettel and Fondren as to Miller's *Brady* claim. *Id.* at 622. [6]

**\*8** *3. Failure to Intervene.* We have recognized in some circumstances, that "officers must affirmatively intervene to prevent other officers from violating an individual's constitutional rights." *Bunkley v. City of Detroit*, 902 F.3d 552, 565 (6th Cir. 2018) (quoting *Holloran v. Duncan*, 92 F. Supp. 3d 774, 794-95 (W.D. Tenn. 2015)). To state a failure-to-intervene claim, the officer must (1) have observed or had reason to know of the constitutional violation and (2) had both the opportunity and the means to prevent the violation from occurring. *See Turner v. Scott*, 119 F.3d 425, 429 (6th Cir. 1997); *see also Jacobs v. Vill. of Ottawa Hills*, 5 F. App'x 390, 395-96 (6th Cir. 2001) (reversing the denial of qualified immunity to an officer who arrived on the scene too late to observe or have reason to know whether the arrest was lawful).

Here, Miller alleges in the most general terms that "one or more of Defendants observed or had reason to know that [the constitutional violations discussed above] were occurring and did not intervene to try to stop such violations." Compl. ¶ 89. The district court denied Gettel and Fondren's motion to dismiss, finding that Miller plausibly alleges that "widespread problems with the [DataMaster DMT] machines were discovered before he pleaded guilty and was sentenced," and that, "Gettel and Fondren ... could have informed the Tecumseh Police Department and/or the Lenawee County Prosecutor prior to January 2020 that the subject machine had failed its inspection, and thus was inaccurate and unreliable." *Miller*, 575 F. Supp. 3d at 863.

As already discussed, however, awareness of general deficiencies in the work of Intoximeters' technicians fails to plausibly allege that either Gettel or Fondren knew that the subject device had not been properly certified before Miller's breath was tested, so there can be no failure-to-intervene claim based on fabrication of evidence. And because we are bound by *Robertson*, Miller has no claim for failure to intervene with respect to the alleged suppression of evidence. Qualified immunity bars this claim.

*4. Failure to Train or Supervise.* In this instance, it is Miller who appeals the *dismissal* of this claim against Gettel and Fondren. Miller argues that Gettel's failure to properly supervise the Breath Alcohol Program resulted in the subject DataMaster DMT "remaining in use despite the machine failing an inspection check on February 15, 2019." (2d Br., p. 30.) Similarly, Miller contends that Fondren's failure to supervise Intoximeters' employees whose work did not align with national standards also resulted in the subject DataMaster DMT remaining in use after February 15, 2019. (2d Br., p. 30-31.)

"[A] supervisor cannot be held liable simply because he or she was charged with overseeing a subordinate who violated the constitutional rights of another." *Peatross v. City of Memphis*, 818 F.3d 233, 241 (6th Cir. 2016) (citing *Gregory v. City of Louisville*, 444 F.3d 725, 751 (6th Cir. 2006)). "[A] mere failure to act will not suffice[.]" *Id.* Rather, the "failure to supervise, control or train the offending individual is not actionable *unless* the supervisor either encouraged the specific incident of misconduct or in some other way directly participated in it." *Id.* at 242 (quoting *Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999)). This means, "[a]t a minimum," Miller must plausibly allege that "the official at least implicitly authorized, approved, or knowingly

acquiesced in the unconstitutional conduct of the offending officers." *Shehee*, 199 F.3d at 300.

**\*9** Miller continues to rely on *Taylor v. Michigan Dep't of Corr.*, 69 F.3d 76, 81 (6th Cir. 1995), and *Hill v. Marshall*, 962 F.2d 1209 (6th Cir. 1992). But, as this court subsequently explained, neither decision holds that a knowing abdication of supervisory responsibilities is enough to establish liability for a subordinate's unconstitutional acts. *See Gregory*, 444 F.3d at 751-52. The district court observed as much, and concluded that Miller's claims against Gettel and Fondren for failure to train and supervise were based on an alleged failure to act. Miller does not plausibly allege that Gettel or Fondren implicitly authorized, approved, or knowingly acquiesced in the allegedly unconstitutional conduct by the Intoximeters' technician who left the subject device in use after it failed to pass inspection on February 15, 2019.

### IV.

Relying on the same factual basis discussed above, Miller alleges that Intoximeters and the MSP Defendants are liable for negligence and misrepresentation under Michigan law. The district court granted the defendants' motions to dismiss these claims, except for the negligence claim against Gettel and Fondren. We affirm in part and reverse in part.

### A.

Starting with the claims of fraud and misrepresentation, Miller alleges that Gettel and Fondren were responsible for providing the subject DataMaster DMT with representations to the Tecumseh Police Department and Lenawee County Prosecutor that it would produce accurate and reliable BAC evidence. The gravamen of Miller's complaint, however, is not that the subject device was *never* accurate or reliable—it is that prior representations about the device's accuracy and reliability *became* false "once [Gettel and Fondren] were informed that the subject machine failed its inspection." (2d Br., p. 52.) Miller also alleges that Intoximeters' deceptive falsification of certification records caused the subject device to remain in use even though it was no longer accurate or reliable. (2d Br., p. 56.) And, Miller argues that defendants may be liable for failing to disclose to the local authorities that the subject DataMaster DMT failed inspection and could no longer be considered accurate or reliable after February 15, 2019.

2023 WL 2945340

Michigan recognizes several interrelated but distinct fraud doctrines. *See Titan Ins. Co. v. Hyten*, 817 N.W.2d 562, 567 (Mich. 2012). But fraudulent misrepresentation requires that the defendant made a false statement to the plaintiff about the past or present. *Id.* at 567-68; *see also Lawrence M. Clarke, Inc. v. Richco Const., Inc.*, 803 N.W.2d 151, 162 (Mich. 2011). Because no representations were made to plaintiff by any of the defendants, a claim has not been stated under that theory. Miller argues that he nonetheless has stated a claim for "silent fraud" or "third-party fraud." We disagree.

Third-party fraud is recognized in Michigan when "a party makes false representations to another with the intent or knowledge that they be exhibited or repeated to a third party for the purpose of deceiving ... the third party." *Oppenhuizen v. Wennersten*, 139 N.W.2d 765, 768 (Mich. Ct. App. 1966) (emphasis omitted). This theory does not fit here. Representations that the subject DataMaster DMT was accurate and reliable when provided to Tecumseh Police Department were not false. Miller's claim is that they became false when the Intoximeters' technician left the subject device in service after it failed inspection on February 15, 2019. No affirmatively false representations were allegedly made to third parties with the intent or knowledge that they would be repeated to Miller for the purpose of deceiving him.

Fraud by omission, or "silent fraud," requires more than mere non-disclosure of a fact. *See Hord v. Env. Res. Inst. of Mich.*, 617 N.W.2d 543, 550 (Mich. 2000) (citing *U.S. Fidelity and Guaranty Co. v. Black*, 313 N.W.2d 77, 88 (Mich. 1981)). "In order for the suppression of information to constitute silent fraud there must be a legal or equitable duty of disclosure." *Id.* (quoting *U.S. Fidelity*, 313 N.W.2d at 88). Such a duty arises most commonly "where inquiries are made by the plaintiff, to which the defendant makes incomplete replies that are truthful in themselves but omit material information." *Id.* But no incomplete representation to Miller is alleged.

**\*10** Miller also argues that the duty to disclose may arise when a party to a transaction has newly acquired information "that is recognized [by that party] as rendering a prior affirmative statement untrue or misleading." *Alfieri v. Bertorelli*, 813 N.W.2d 772, 775 (Mich. Ct. App. 2012) (citing *U.S. Fidelity*, 313 N.W.2d at 89); *see also Titan Ins.*, 817 N.W.2d at 567 (noting fraud theories include "silent fraud, also known as fraudulent concealment"). But Miller was not party to any agreement. Where there was no prior affirmative representation to Miller himself, the after-acquired information—that the subject device failed inspection on February 15, 2019—cannot be the basis for Miller's silent-fraud claim. And, crucially, Miller has not plausibly alleged that the defendants suppressed the truth "with intent to defraud" *him. See M&D, Inc. v. W.B. McConkey*, 585 N.W.2d 33, 37 (Mich. Ct. App. 1998) (quoting *William v. Benson*, 141 N.W.2d 650, 654 (Mich. 1966)). The fraud and misrepresentation claims were properly dismissed.

B.

In Michigan, a negligence claim requires proof of "four elements: duty, breach of that duty, causation, and damages." *Fultz v. Union-Commerce Assocs.*, 683 N.W.2d 587, 590 (Mich. 2004). Governmental employees like Gettel and Fondren, however, are entitled to governmental immunity when (1) the employee "is acting or reasonably believes he or she is acting within the scope of his or her authority," (2) "[t]he governmental agency is engaged in the exercise or discharge of a governmental function," and (3) the challenged "conduct does not amount to gross negligence that is the proximate cause of the injury or damage." MCL § 691.1407(2); *see also Kindl v. City of Berkley*, 798 F.3d 391, 403 (6th Cir. 2015). Only the third requirement is in dispute.

"Gross negligence" is defined as "conduct so reckless as to demonstrate a substantial lack of concern for whether an injury results." MCL § 691.1407(8)(a). We are not bound by Miller's conclusory allegation that "Defendants exhibited deliberate indifference amounting to gross negligence." Compl. ¶ 104. It is clear that ordinary negligence will not satisfy this standard. *See Wood v. City of Detroit*, 917 N.W.2d 709, 714 (Mich. Ct. App. 2018). Also, merely "alleging that an actor could have done more is insufficient under Michigan law, because, with the benefit of hindsight, a claim can always be made that extra precautions could have influenced the result." *Id.* (quoting *Tarlea v. Crabtree*, 687 N.W.2d 333, 339 (Mich. Ct. App. 2004)). Instead, the standard for gross negligence "suggests 'almost a willful disregard of precautions or measures to attend to safety and a singular disregard for substantial risks.' " *Id.* (quoting *Tarlea*, 687 N.W.2d at 339).

Whether gross negligence can be established in this case remains to be seen. But Miller alleges that Gettel and Fondren had day-to-day responsibility for overseeing the Breath Alcohol Program, knew that the DataMaster DMTs

Case 2:24-cv-10184-MAG-DRG   ECF No. 141-5, PageID.6662   Filed 04/15/26   Page 9 of 11

Miller v. Gettel, Not Reported in Fed. Rptr. (2023)
2023 WL 2945340

would be used to produce evidence to be used in criminal prosecutions, and became aware of deficiencies in the work of Intoximeters' technicians, including the failure to maintain and certify the DataMaster DMTs, sometime after the workflow requirements were imposed in April 2019, and those deficiencies were relied upon in requiring a corrective action plan in August 2019. Because this question of governmental immunity depends on what Gettel and Fondren were aware of, we cannot say at the motion-to-dismiss stage in this case whether their conduct was grossly negligent (*i.e.*, so reckless as to demonstrate a substantial lack of concern for whether people would be held criminally liable on the basis of false or unreliable breath alcohol evidence).

For gross negligence to be the proximate cause of injury under MCL § 691.1407(2), the MSP Defendants' conduct must be "the one most immediate, efficient, and direct cause of [Miller's] injury." *Ray v. Swager*, 903 N.W.2d 366, 372 (Mich. 2017) (quoting *Robinson v. Detroit*, 613 N.W.2d 307, 319 (Mich. 2000)). That determination "does not entail the weighing of factual causes but instead assesses the legal responsibility of the actors involved." *Id.* at 376. Miller seems to allege more than one cause-in-fact for his injury —the deficient inspection of the subject device itself and reckless disregard for the risk that there were deficiencies in inspections and maintenance that could affect the accuracy and reliability of the DataMaster DMTs (as in Miller's case). Nonetheless, the complaint plausibly alleges that gross negligence by Gettel and Fondren was the proximate cause of Miller's injury where disclosure that the subject device failed inspection one month before it was used to test Miller's breath resulted in the immediate dismissal of Miller's conviction by a Nolle Prosequi Order. The district court did not err in denying the MSP Defendants' motion to dismiss this claim.

## C.

**\*11** Finally, the district court also dismissed the negligence claim against Intoximeters, finding that Intoximeters owed no duty in tort to Miller as a non-contracting third party. Miller argues that this is a misapplication of Michigan law, in particular, the "separate and distinct" analysis reaffirmed by the Michigan Supreme Court in *Loweke v. Ann Arbor Ceiling & Partition Co.*, 809 N.W2d 554 (Mich. 2011). Miller is correct to emphasize that the focus of the inquiry is not whether the defendant's conduct was separate from its contractual obligations. *See id.* at 559-60. As *Loweke* explained, "a contracting party's assumption of contractual obligations does not extinguish or limit separate, preexisting common-law or statutory tort duties owed to noncontracting third parties in the performance of a contract." *Id.* at 562. Here, Miller argues that Intoximeters owed him an independent "common-law duty to exercise reasonable care and avoid harm when [it] acts." *Id.* at 561.

Whether a tort claim asserts a breach of duty separate and distinct from the contract can be "difficult to discern." *Id.* at 558. But, as *Loweke* clarified, an action "based solely on a defendant's failure or refusal to perform a contractual promise" lies in contract. *Id.* That was the case in *Fultz*, which held that "a woman who fell on an icy parking lot could not assert a negligence claim against the snow-plow company that completely failed to clear the lot, breaching its contract with the lot's owner." *Leone v. BMI Refractory Servs., Inc.*, 893 F.3d 359, 362 (6th Cir. 2018) (discussing *Fultz*, 683 N.W.2d at 589). *Fultz* also distinguished another slip-and-fall case, finding that the contractor there breached a duty separate and distinct from the contract by negligently moving snow so as to create a new hazard. *Fultz*, 683 N.W.2d at 593 (discussing *Osman v. Summer Green Lawn Care, Inc.*, 532 N.W.2d 186 (Mich. Ct. App. 1995)).

These examples illustrate the scope of Michigan's common-law duty, which "imposes on every person engaged in the prosecution of any undertaking an obligation to use due care, or to so govern his actions as not to unreasonably endanger the person or property of others." *Clark v. Dalman*, 150 N.W.2d 755, 760 (Mich. 1967). As reiterated in *Fultz*, "[i]f one voluntarily undertakes to perform an act, having no prior obligation to do so, a duty may arise to perform the act in a nonnegligent manner." *Fultz*, 683 N.W.2d at 591. Thus, Michigan adheres to the common-law principle that "if one having assumed to act, does so negligently, then liability exists as to a third party for failure of the defendant to exercise care and skill in the performance itself." *Loweke*, 809 N.W.2d at 561 (cleaned up) (quoting *Davis v. Venture One Constr., Inc.*, 568 F.3d 570, 571 (6th Cir. 2009)).

Miller alleges that "Defendants owed a duty of care to the Plaintiff, who was prosecuted using evidence derived from the negligently maintained DataMaster DMTs." Compl. ¶ 98. On appeal, Miller argues that Intoximeters negligently performed its duties under the contract by, among other things, failing to perform timely 120-day certifications, failing to identify or fix malfunctions with the DataMaster DMTs, and failing to remedy the dysfunctional subject device after it failed inspection on February 15, 2019. These failures,

however, are like the snow-removal company's failure to clear any snow or ice from the parking lot in *Fultz* that did not give rise to a duty separate and distinct from the contract. But Miller also alleges that Intoximeters deficiently performed the inspection of the subject DataMaster DMT and "[e]ngaged in 'deceptive' falsification of 'certification records.' " Compl. ¶ 99. That implicates an independent common-law duty to perform and record certification inspections in a non-negligent manner. *See, e.g., Leone*, 893 F.3d at 363 ("When BMI performed on its contract—especially when it inspected the alloy chute for any loose slag—it 'assumed to act' [and] thereby took on 'a duty ... to perform the act in a nonnegligent manner.' " (citing *Fultz*, 683 N.W.2d at 591)). We find that Miller plausibly alleges that Intoximeters undertook actions with respect to the certification of the subject device that give rise to a common-law duty separate and distinct from its obligations under the contract with the State of Michigan.

## V.

**\*12** Accordingly, we **AFFIRM in part, REVERSE in part, and REMAND** Miller's negligence claims against the MSP Defendants and Intoximeters for further proceedings consistent with this opinion.

LARSEN, Circuit Judge, concurring.

I join the majority opinion in full. I write separately to point out an additional reason why Miller's failure to intervene claim is barred by qualified immunity—Miller has not cited (and cannot cite) any clearly established law in support of his claim.

The majority opinion correctly notes our "recogni[tion], in *some circumstances*, that 'officers must affirmatively intervene to prevent other officers from violating an individual's constitutional rights.' " Maj. Op. at 16 (emphasis added) (quoting *Bunkley v. City of Detroit*, 902 F.3d 552, 565 (6th Cir. 2018)). When considering the "clearly established" prong of a qualified immunity claim, it is the particular circumstances that do all the work. *See Rivas-Villegas v. Cortesluna*, 142 S. Ct. 4, 8 (2021); *see also Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (per curiam) ("The dispositive question is whether the violative nature of *particular* conduct is clearly established." (citation omitted)).

So, "to show a violation of clearly established law, [Miller] must identify a case" that would have put Gettel and Fondren

on notice that their "specific conduct was unlawful." *Rivas-Villegas*, 142 S. Ct. at 8. Miller does not have one. Each case Miller offers is readily distinguishable. Two involved an officer's failure to intervene in the violation of a different constitutional right. *Bruner v. Dunaway*, 684 F.2d 422, 426 (6th Cir. 1982) (excessive force); *Jacobs v. Vill. of Ottawa Hills*, 5 F. App'x 390, 395 (6th Cir. 2001) (false arrest). And the third, *Smith v. Ross*, 482 F.2d 33 (6th Cir. 1973), didn't involve a failure to intervene claim at all. Such "materially distinguishable" cases are not sufficient to show clearly established rights. *Rivas-Villegas*, 142 S. Ct. at 8 ("Even assuming that Circuit precedent can clearly establish law for purposes of § 1983, [the circuit court precedent] is materially distinguishable and thus does not govern the facts of this case.").

*Bunkley* cannot help Miller either. *Bunkley* was an "unjustifiable arrest" case. *See* 902 F.3d at 555. So the most *Bunkley* can do is clearly establish that officers have a duty to intervene in false arrests that are "materially indistinguishable" from the circumstances of the false arrest at issue in *Bunkley*. *Bunkley*'s broad language gesturing toward other constitutional violations not at issue in that case cannot clearly establish that officers have a duty to intervene in *any* constitutional violation under *any* factual circumstances. Instead, the clearly established "inquiry 'must be undertaken in light of the specific context of the case, not as a broad general proposition.' " *Rivas-Villegas*, 142 S. Ct. at 8 (citation omitted). Miller readily acknowledges that "most failure-to-intervene claims involve allegations of excessive force." Second Br. at 27. And he cites no case holding an officer liable for failure to intervene in any constitutional violation other than excessive force or false arrest. It follows, then, that Miller has not produced a case "materially [in]distinguishable" from his own; and neither is this the "obvious case." *Rivas-Villegas*, 142 S. Ct. at 8. Gettle and Fondren are entitled to qualified immunity on this basis alone.

**\*13** But, as the majority opinion correctly concludes, Miller's claim fails on the merits as well, so I concur. *See Crawford v. Tilley*, 15 F.4th 752, 760 (6th Cir. 2021) (noting that we may address the qualified immunity prongs in any order).

**All Citations**

Not Reported in Fed. Rptr., 2023 WL 2945340

**Miller v. Gettel, Not Reported in Fed. Rptr. (2023)**

2023 WL 2945340

---

### Footnotes

1   The conditions of Miller's sentence included intensive Alcoholics Anonymous meetings, twice-a-day breathalyzer testing, 240 hours of community service, costs of $1,000, and 18 months of probation. Compl. ¶ 61.

2   Miller has not pursued claims against the John Doe defendants individually. Also, MSP Sgt. Curtis was dismissed by stipulation because he retired before September 2018.

3   *See* Michigan State Police, *Update on State's Evidential Breath Alcohol Testing Program*, https://content.govdelivery.com/attachments/MIMSP/2020/01/16/file_attachments/1360299/Update_on_States_Evidential_Breath_Alcohol_Testing_Program.pdf?fbclid=IwAR3ZQ3va1NNLRdS8uiKqLzmleWJRDK-dqchrxMTHTieVfgARc0rdzGsz8 (last visited Mar. 17, 2023).

4   Two Intoximeters technicians were charged with fraud in May 2020—one pleaded guilty to charges in December 2020 and the other was convicted following a jury trial in May 2022.

5   *Robertson* did not decide whether there could be an underlying *Brady* claim, and the two circuits to decide the question have reached opposite conclusions. *Compare Alvarez v. City of Brownsville*, 904 F.3d 382, 392-94 (5th Cir. 2018) (en banc) (finding no *Brady* right to exculpatory evidence pre-plea bargaining), *with United States v. Ohiri*, 133 F. App'x 555, 561-62 (10th Cir. 2005) (interpreting *Ruiz* to permit *Brady* claim for non-disclosure of exculpatory evidence pre-plea bargaining). One circuit suggested a claim without mentioning *Ruiz*, *see Smith v. Baldwin*, 510 F.3d 1127, 1148 (9th Cir. 2007) (en banc), and other circuits have identified the issue without deciding it, *see McCann v. Mangialardi*, 337 F.3d 782, 788 (7th Cir. 2003), *United States v. Moussaoui*, 591 F.3d 263, 285 (4th Cir. 2010), *Friedman v. Rehal*, 618 F.3d 142, 154 (2d Cir. 2010), and *United States v. Mathur*, 624 F.3d 498, 506-07 (1st Cir. 2010).

6   Miller argues that it does not matter that he pleaded guilty to this charge, relying on *Sanford v. City of Detroit*, No. 17-13062, 2018 WL 6331342, at *8-9 (E.D. Mich. Dec. 4, 2018). But the question addressed there was whether the mid-trial guilty plea was a "superseding cause" that cut off liability for the alleged *Brady* violation.

---

**End of Document**      © 2025 Thomson Reuters. No claim to original U.S. Government Works.